# Supreme Court of Texas

No. 20-0079

James Construction Group, LLC and
Primoris Services Corporation,

*Petitioners,*

v.

Westlake Chemical Corporation,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued October 26, 2021**

JUSTICE LEHRMANN delivered the opinion of the Court, in which Justice Young joined in full, in which Chief Justice Hecht, Justice Devine, Justice Busby, and Justice Bland joined as to Parts I and II(D), and in which Justice Boyd, Justice Blacklock, and Justice Huddle joined as to Parts I, II(A), II(B), II(C), and II(E).

CHIEF JUSTICE HECHT filed an opinion dissenting in part, in which Justice Devine, Justice Busby, and Justice Bland joined.

JUSTICE BOYD filed an opinion dissenting in part, in which Justice Blacklock and Justice Huddle joined.

This case arises out of a construction contract dispute and involves competing claims of breach stemming from the owner's replacement of a contractor for safety violations and the owner's claimed entitlement to excess costs incurred in having to change contractors. The jury found that both the owner and the contractor breached the contract in various respects and awarded damages and attorney's fees to both. The principal issues raised in this Court are: (1) whether the owner's entitlement to recover contract damages associated with a termination of the contractor for default hinged on strict (or only substantial) compliance with the written-notice conditions precedent to such recovery; (2) if substantial compliance with the notice conditions was sufficient, whether legally sufficient evidence supports the jury's finding of compliance despite the fact that at least two of the required notices were not given in writing; and (3) whether a contractual provision barring recovery of consequential damages merely waived liability for such damages or constituted a covenant not to sue, such that asserting a claim to recover consequential damages amounted to a breach of the contract.

The court of appeals held, among other things, that strict compliance was not required, that legally sufficient evidence supported the jury's substantial-compliance findings, and that the contractual provision governing consequential damages was a liability waiver, not a covenant not to sue. Accordingly, the court of appeals affirmed the portion of the trial court's judgment awarding damages and attorney's fees to the owner but reversed as to the contractor.

We agree with the court of appeals that, as a general matter under Texas law, a party's substantial compliance with contractual notice conditions is sufficient to satisfy those conditions. However, when a contract mandates written notice, a writing is a necessary part of complying with that condition, substantially or otherwise. A contrary holding would allow parties to elide the bargain they freely made and would open the door to a host of factual disputes about whether proper contractual notice was given—the very kinds of disputes that the writing requirement is intended to foreclose.

Because the owner failed to provide the requisite written notices to be entitled to recover expenses associated with a termination for default, and because we disagree with the owner's alternative argument that it was independently entitled to recover those same expenses under a different contractual provision, the judgment awarding them to the owner cannot stand. However, the portion of the judgment awarding the owner damages for the contractor's breach of an indemnity provision in the contract was properly upheld. Further, we agree with the court of appeals that the contract did not contain a covenant not to sue for consequential damages and thus hold that the portion of the judgment awarding damages to the contractor was properly reversed. Accordingly, we affirm the court of appeals' judgment in part, reverse it in part, and remand the case to the trial court for further proceedings consistent with this opinion.

3

## I. Background

## A. Facts and Pertinent Contractual Provisions

In May 2012, Westlake Chemical Corporation, on behalf of its subsidiary Westlake Vinyls Company, L.P.,[1] hired James Construction Group, LLC, as a general contractor to perform civil and mechanical construction work on Westlake Vinyls' chlor-alkali plant in Geismar, Louisiana. Primoris Services Corporation, James's parent company, guaranteed the contract.

The contract itself did not obligate Westlake Chemical to assign James any work. Rather, under Section 1.2, if Westlake wanted James to "perform certain services and/or provide equipment, materials, supplies or other products," and James "agree[d] to perform and/or provide such Work," then Westlake would issue a work order for James to execute.[2] The contract confirmed that "[u]nless and until a Work Order has been executed by the Parties," Westlake was not obligated "to retain [James] for any Work" and James was not obligated "to accept any request for any Work." Further, Westlake was entitled to "retain other contractors to perform comparable work" as it saw fit.[3]

---

[1] Unless necessary for clarity or context, we refer to Westlake Chemical and Westlake Vinyls collectively as Westlake.

[2] James had five days after issuance to either return the executed work order or advise Westlake as to any issues James had with the order and negotiate in good faith with Westlake to resolve those issues.

[3] Relatedly, James "acknowledge[d]" under Section 15.7 that Westlake "may have the need or desire to enter into other contracts related to the Work or the Project" and "agree[d] to cooperate and coordinate with all other contractors of [Westlake] or its Affiliates."

James was contractually "responsible for the safety and health of its employees and Subcontractors" and "for the adequacy, stability and safety of all operations, construction temporary facilities, construction equipment and the construction site and methods necessary for the performance of the Work." At the same time, the contract gave Westlake certain rights to "intervene" if it had safety concerns. Specifically, Section 17.2 authorized Westlake "to intervene in any appropriate way" if in its reasonable opinion James was, among other things, "performing its duties under th[e] Contract in an unsafe way or manner" that Westlake "believe[d] may cause injury or damage to persons or property." In such cases, Westlake had the "right to require [James] to immediately take remedial action," and James would be "solely accountable for all costs associated with such intervention and remedial action" regardless of who incurred the costs.

Section 21 of the contract governed termination. Under Section 21.2, either party could cancel the contract with sixty days' written notice. Section 21.5 further authorized Westlake, "at any time," to terminate the contract "for [Westlake's] convenience and without cause." James was required to take certain actions upon receipt of written notice of Westlake's termination for convenience and was "entitled to receive payment for Work executed, and reasonable actual costs incurred by reason of such termination."

Finally, Section 21.3 authorized Westlake to terminate James for "[d]efault" if Westlake determined "in its reasonable opinion" that

5

James, among other things, had "serious safety violations."[4] To terminate under Section 21.3, Westlake was required to give James three notices: (1) notice that Westlake had determined there were serious safety violations, triggering a seventy-two-hour window for James to "begin to remedy" the violations; (2) notice that Westlake was "not reasonably satisfied with the pace and the quality of the remediation effort"; and (3) notice that Westlake had elected to terminate the contract or a portion of the work. Per Section 9.1, all notices given pursuant to the contract were required to be in writing. Upon termination of the contract under Section 21.3, Westlake had the "right to take possession of the Work or the portion thereof terminated" and to complete that work, with James being responsible for "[a]ny extra costs in excess of the Contract Price incurred by [Westlake]."

Following the contract's execution, James performed both civil and mechanical work on the project on a cost-reimbursable basis in accordance with work orders issued by Westlake. The record shows that James had several safety incidents between May 2012 and April 2013—when Westlake transferred all remaining mechanical work to another contractor—including multiple "OSHA-recordable" injuries and "near misses." Though the parties dispute the precise nature, severity, and cause of many of the safety incidents, it is undisputed that James was

---

[4] Other grounds authorizing termination for default were: James was "willfully or in bad faith violating" the contract; James was failing to perform the work "with promptness and diligence"; James filed for bankruptcy; and James "fail[ed] to perform any material obligation under" the contract.

6

cited for a serious safety violation that occurred on December 28, 2012, when James employee Gregory Price suffered a fatal injury on the job.[5]

Immediately following the incident, the parties began discussing James's safety record. In an internal Westlake email to project manager Abram Kuo and others, Westlake Vice President Andrew Kenner began inquiring about James's Total Recordable Incident Rate and proposed a safety review with James to "show us how" James would prevent further such incidents, saying that "[t]his was completely preventable." Kuo forwarded that email to other Westlake employees and copied James's project site manager Rusty DeBarge, adding "see Andrew's comment" and stating that "[w]e have to develop preventive safety mind set [sic] with some extraordinary measure[s] on job safety." Kuo further noted in the email that he would be at the project office on January 2, 2013, for a safety meeting that James's management had "been asked to attend." Kenner testified that the meeting's focus was on improving safety performance "to make sure we didn't have another serious incident."

After the meeting, Westlake internally discussed the possibility of moving a portion of the mechanical work to another contractor "so that James could have a better chance to manage their scope and keep their project safe." The next day, January 3, Kuo contacted Turner Industries Group, LLC, about potentially taking over some of that work.

---

[5] Price was on a ladder leaning against a large truck when another James employee flagged the truck forward without checking to make sure no one was on the ladder. Price fell and sustained a fatal head injury. OSHA later cited James for the incident as a serious violation.

For James's part, on January 9, a week after the meeting, DeBarge sent an email to several Westlake employees summarizing James's pre-accident safety procedures and listing several additional post-accident procedures that James had implemented or was planning to implement. On January 18, he sent Kuo another email stating that he was aware of talk that Westlake was considering "changes in the execution of the project going forward." DeBarge asked Kuo to consider the email an "appeal" of that consideration and emphasized James's safety improvements and ability to successfully manage and coordinate future work. He advocated for James receiving as much potential work as possible, but he admitted that the addition of certain offsite work would "be a challenge to our group" because it would require an "attention level" that had "the potential to affect our efforts within the plant boundaries," such that he did "not see a negative effect on the project if those scopes of work were given to another contractor."

Kuo responded to DeBarge's email the same day, agreeing that "we have done many good things and set up very good programs" on the project, including with respect to safety, and stating that "a lot of credit[] has to go to [James] and its demonstrated willingness to work on [the] project." He confirmed the "decision to introduce possible [sic] another contractor" for the purpose of "ensuring Westlake/[James] will be successful" on the project and stated that Westlake "[n]ever intended to wipe out what [James] has been doing well for the project thus far especially the areas mentioned by" DeBarge's email. He further stated that he saw it "necessary" to "separat[e] out independent jobs such as EDC [ethylene dichloride] and pipelines" to address DeBarge's admitted

8

concern that they "ha[d] the potential to affect [James's] efforts within the plant boundaries." About two weeks later, on January 30, Westlake Vinyls and Turner executed a formal contract very similar to the one between Westlake Chemical and James, and Westlake began allocating offsite EDC and pipeline work to Turner. There is no dispute that the contract between Westlake and James authorized Westlake to contract with Turner to perform that work regardless of Westlake's satisfaction with James's performance.

Kuo testified that James's safety performance improved in January but deteriorated again in February. Westlake's site manager, Scott Campbell, testified that starting in January, James had brief periods without incident followed by regression into old patterns. Internal Westlake emails—which were not sent to James—stressed James's unacceptable Total Recordable Incident Rate and Westlake's dissatisfaction with James's safety improvements, while internal James emails reflect concerns about Westlake's "unrealistic expectations and misperceptions regarding their own impact on our performance." In any event, James removed DeBarge as site manager in late February at Westlake's request and replaced him with Mark Lammon.

On March 6, Kenner informed Kuo in an internal Westlake email that "I think we need to let James Construction know that we are considering removing them from the job and putting them on notice." However, nothing in the record reflects that Westlake communicated as much to James at that time. In a March 22 internal Westlake email, Kenner communicated that James's Total Recordable Incident Rate for the entire project was "2.2+"—higher than the industry standard—but

9

he also noted a recent safety audit reflecting that "James has stepped up their safety monitoring and performance." Kuo responded, again internally, that since December 2012, Westlake had "seen a trend in poor performance of [James's] safety record as well as its productivity in general coupled with indications of quality issue[s] on piping (excellent in civil and structural and equipment setting)." Kuo further stated that Westlake had assigned more mechanical work to Turner "to spread the job out so that [James] can be more focus[ed] on addressing all the issues mentioned," that lightening James's load had allowed it to focus on those issues, that James's new site manager "has made differences as even our corporate people have noticed," and that Turner should be set up "as a strong back up if [James] continues the poor performance after the scope splitting so that project [sic] will not be in danger of delay."

According to Westlake, additional incidents after that internal March 22 discussion as well as scheduling delays led Campbell to recommend on April 2 that Westlake remove "the remaining mechanical work" from James and assign it to Turner. Kuo agreed. On April 11, James and Westlake representatives had an in-person meeting. According to Campbell's description of the meeting, he informed James:

> [W]e have tried to get y'all to improve your safety, we've done everything we can do, y'all brought another project manager in here, you are falling back into the same pattern. We want you to – I think I said, you have five days to get your remaining piping and mechanical people off the job.

James VP Conrad Bourg testified by deposition that the meeting was "very brief," and that Westlake told James at the meeting that "they were reassigning our work to Turner."

It is undisputed that Westlake sent no written notice of termination before or after the April 11 meeting. The record also contains no other written communication from Westlake to James memorializing the actions taken at that meeting. Nevertheless, James ceased mechanical work and confirmed via email on May 8 that at Westlake's direction, James "has discontinued mechanical work on the Chlor-Alkali project and . . . completed the demobilization of the mechanical forces." Westlake allocated the remaining mechanical work to Turner and ultimately paid James in full for the mechanical work it had already completed. James also retained and completed the civil work on the project and was paid for that work. Turner completed all remaining mechanical work on October 31, 2013.

## B. Procedural History

In December 2014, Westlake sued James and guarantor Primoris for breach of contract, seeking damages in the form of costs associated with transferring work from James to Turner.[6] Initially, Westlake alleged that James was responsible for those costs under Section 21.3 of the contract following its termination for default. Westlake subsequently amended its petition to allege that James was responsible

---

[6] Westlake sued other contractors as well, and James asserted claims against various third-party defendants. Those claims have all been dismissed or severed and are not at issue here.

11

for the costs under both Section 21.3—the provision governing termination for default—and Section 17.2—the provision governing Westlake's right to intervene if it determined James was performing unsafely. Westlake also claimed that James breached its duty to indemnify Westlake under Section 19.1 of the contract for the costs Westlake incurred in defending itself in a wrongful-death suit brought by Price's family.[7]

James denied that Westlake had terminated the contract for default but alternatively counterclaimed for breach of contract, alleging that Westlake breached Section 21.3 by improperly terminating James without the required notices. James also alleged that Westlake breached Section 26 by making claims for consequential damages that the contract expressly prohibited.

James also moved for partial summary judgment, arguing that a significant portion of the damages Westlake sought qualified as consequential damages barred by Section 26 of the contract, entitled "Waiver of Consequential Damages." The trial court granted James's motion "only as to Westlake's chlorine costs"—that is, the trial court found as a matter of law that those costs constituted consequential damages that were barred by the contract—and denied the motion as to Westlake's other alleged damages. The case proceeded to a jury trial on

---

[7] Section 19.1 required James to indemnify Westlake against all claims and liabilities, as well as defense costs, arising out of or related to James's performance of the work, but only to the extent of James's "negligence, strict liability or other legal fault." (Capitalization removed).

12

Westlake's contract claims under Sections 17.2, 19.1, and 21.3 and on James's counterclaims under Sections 21.3 and 26.

The jury found that James failed to comply with Section 17.2 (the intervention provision), that the failure was not excused, and that Westlake was entitled to $1,054,251.81 in damages in the form of the costs associated with its intervention.[8]  As to Westlake's claim under Section 21.3, the charge asked the jury three predicate questions—3A, 3B, and 3C—to determine whether Westlake provided the three requisite notices under that provision.  Questions 3A and 3B each asked the jury (1) whether Westlake "provided written notice in strict compliance with this notice provision," (2) whether Westlake "notified James in 'substantial compliance' with this notice provision," and (3) whether "[s]trict compliance with this notice provision would have been 'futile.'"  Question 3C, regarding the third required notice, asked only whether Westlake substantially complied with the provision.  To answer "yes" to the substantial-compliance questions, the jury had to find that "James received actual notice from Westlake," the "form of actual notice to James did not severely impair the purpose of this notice provision," and the form "caused no harm to James."

The jury answered "no" to the portions of 3A and 3B asking whether Westlake provided written notice in strict compliance with the first two notice provisions and whether strict compliance would have been futile, but it found that Westlake substantially complied with all three notice provisions.  The jury went on to find that James failed to

_____

[8] Westlake had asked the jury to award it $8.5 million.

13

comply with Section 21.3,[9] that the breach was not excused, and that Westlake was entitled to damages in the same amount that the jury had awarded for James's breach of Section 17.2. The jury also found that James failed to comply with Section 19.1, that the breach was not excused, and that Westlake was entitled to recover damages comprising its costs and reasonable attorney's fees incurred in defending the Price litigation.

Because the jury found that Westlake substantially complied with Section 21.3's notice provisions and James failed to comply with Section 21.3, the jury was instructed not to answer the questions regarding James's counterclaim for Westlake's breach of that section or the question of which party "failed to comply with a material obligation

---

[9] The jury was instructed that James failed to comply with Section 21.3 if:

- Westlake Chemical discovered or determined in its reasonable opinion that James had serious safety violations[;] and

- Westlake Chemical was not reasonably satisfied with the pace and the quality of the remediation effort; and

- Westlake Chemical terminated the Construction Contract or a portion of the Work, and took possession of the Work or the portion thereof terminated and purchased and/or hired materials, tools, supervision, labor, and equipment for the completion of the Work; and

- James has not paid Westlake Chemical for some or all of the extra costs in excess of the Contract Price incurred by Westlake Chemical in regards to taking possession of the Work or the portion thereof terminated and purchasing and/or hiring materials, tools, supervision, labor, and equipment for the completion of the Work.

14

of the Construction Contract [not including Sections 19.1 and 26] first." As to James's counterclaim for breach of Section 26, the jury found that Westlake failed to comply with that provision, that the breach was not excused, and that James was entitled to $1,270,962.89 in damages consisting of attorney's fees James had incurred in defending against both chlorine costs and any other consequential damages, plus additional damages for appellate attorney's fees.

The trial court rendered judgment, largely on the jury's verdict, that: (1) Westlake recover from James and Primoris, jointly and severally, $1,157,019.50 in contract damages, plus court costs and prejudgment interest; (2) Westlake recover from Primoris $2,923,600.50 in attorney's fees (plus conditional appellate attorney's fees); (3) James recover from Westlake $1,270,962.89 in contract damages (plus conditional appellate attorney's fees); and (4) James take nothing on its Section 21.3 counterclaim. The court also ordered post-judgment interest on the various damage awards. All parties appealed.

The court of appeals affirmed the judgment as to the award of damages and attorney's fees to Westlake and reversed as to the award to James on its counterclaim. 594 S.W.3d 722 (Tex. App.—Houston [14th Dist.] 2019). On Westlake's claims, the court unanimously held that the doctrine of substantial compliance applied to Section 21.3's notice requirements and that the evidence was legally sufficient to support both the jury's findings that Westlake substantially complied and the damages award. *Id.* at 746, 748–50. Because it upheld the award under Section 21.3, the court of appeals did not reach James's challenge to the jury's finding that Westlake was entitled to the same

15

damages under Section 17.2. The court further affirmed the judgment as to James's liability for failure to comply with the contract's indemnity provision. *Id.* at 754. As to Westlake's attorney's fees, the court held in pertinent part that Westlake was not required to segregate its fees and that the fees were not excessive. *Id.* at 766. On James's counterclaim, a divided court held that Westlake did not breach the contract by seeking consequential damages because Section 26 was a liability waiver rather than a covenant not to sue; the court thus rendered a take-nothing judgment on James's counterclaim. *Id.* at 764–66. The dissent opined that Section 26 contained a covenant not to sue and would have affirmed the trial court's judgment on that claim. *Id.* at 767 (Frost, C.J., dissenting).

James petitioned for review of the court of appeals' judgment, asserting that the court erred in several respects. On Westlake's claims, James argues that the court of appeals erred in concluding that Westlake could satisfy Section 21.3's notice requirements by "substantially complying" with them, that Westlake did not comply with those conditions and thus may not recover damages for James's purported breach of Section 21.3,[10] and that the jury's findings

_____

[10] James also argues that no evidence supports the jury's liability finding on this claim, which hinged in part on a finding that Westlake Chemical incurred extra costs as a result of James's breach, because it was undisputed that Westlake *Vinyls*, not Westlake *Chemical*, had incurred the pertinent costs. The court of appeals held that because the jury found that "Westlake Chemical enter[ed] into the Construction Contract in its own name, to obtain construction services by James, on behalf and for the benefit of Westlake Vinyls, and with authority to act on behalf of Westlake Vinyls," Westlake Chemical had the right—as Westlake Vinyls' agent—to recover

16

regarding Section 17.2, which the court of appeals did not address, do not provide an independent basis to affirm its judgment. James also argues that Westlake's "prior material breach" of Section 21.3's notice requirements excused its obligation to indemnify Westlake for defense costs incurred in the Price litigation. As to James's breach-of-contract counterclaim under Section 26, James contends that Section 26 did not merely waive its liability for consequential damages but also contained a covenant not to sue, which Westlake breached by seeking such damages in this suit. Accordingly, James argues that the court of appeals erred in reversing the judgment in James's favor on that claim. Finally, James seeks reversal with respect to the award of Westlake's attorney's fees, asserting that Westlake failed to segregate recoverable and unrecoverable fees and that the fee award is excessive.[11]

---

damages suffered solely by Westlake Vinyls. *Id.* at 737–39. James argues that the jury was not instructed as to the effect of its agency findings on the liability question and thus could not have found James liable based on the charge as submitted. Because we hold that Westlake may not recover under Section 21.3 for other reasons, we need not reach this issue.

[11] Westlake complained in the court of appeals that the trial court's judgment found only Primoris liable for Westlake's attorney's fees and argued that it was also entitled to recover those fees from James under Texas Civil Practice and Remedies Code Section 38.001. 594 S.W.3d at 766. The court of appeals affirmed that portion of the judgment, holding that Chapter 38 does not permit recovery of attorney's fees from a limited liability company. *Id.* Westlake cross-petitioned this Court for review of that portion of the court of appeals' judgment but subsequently filed a motion to dismiss the petition, which we granted.

17

## II. Analysis

Because this case involves the parties' contractual rights and obligations, we begin by highlighting applicable general legal principles governing contract interpretation. Texas has a strong public policy favoring freedom of contract. *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 672–73 (Tex. 2020). "When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). We construe the language of an unambiguous contract according to its plain meaning, attempting to give effect to all provisions. *See id.* at 763–64; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Texas courts regularly enforce unambiguous contract language agreed to by sophisticated parties in arms-length transactions. *See Chalker Energy*, 595 S.W.3d at 673. To that end, we do not protect parties "from the consequences of their own oversights and failures in nonobservance of obligations assumed." *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911).

### A. Compliance with Written-Notice Conditions Precedent

James first argues that Westlake failed to comply with express contractual conditions precedent to its right to recover costs associated with terminating James for default under Section 21.3. "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (citation omitted); *see also CDI Eng'g Grp., Inc. v. Admin. Exch., Inc.*, 222 S.W.3d 544, 548

(Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("If the condition is not fulfilled, the contract or obligation attached to the condition cannot be enforced."). The conditions precedent to which James refers are the written notices mandated by Section 21.3, which states in pertinent part:

> Right of Company to Terminate for Contractor Default. If Company [i.e., Westlake] discovers or determines in its reasonable opinion that . . . Contractor [i.e., James] has serious safety violations . . . then [1] Company may so notify Contractor. Upon receipt of any such notice, Contractor shall begin to remedy the breach or defect cited within seventy-two (72) hours. If at any time, Company is not reasonably satisfied with the pace and the quality of the remediation effort, [2] Company will so notify Contractor and Company may thereafter, at its sole discretion, elect to either terminate this Contract or a portion of the Work by [3] providing notice to that effect. After providing such notice, Company shall have the unrestricted right to take possession of the Work or the portion thereof terminated and to purchase and/or hire materials, tools, supervision, labor, and equipment for the completion of the Work or of the unremedied condition, as Company elects. Any extra costs in excess of the Contract Price incurred by Company in this regard shall be at the expense of Contractor. This right is in addition to any other remedies Company may have hereunder.

The parties do not dispute that Section 21.3 contemplated the provision of three separate notices to James: (1) notice that Westlake had determined in its reasonable opinion that James had serious safety violations, triggering a seventy-two-hour window for James to begin to remedy the violations; (2) notice that Westlake was not reasonably satisfied with the pace and quality of the remediation efforts; and (3) notice that Westlake had elected to terminate the contract or a

19

portion of the work. Nor do they dispute that all notices under the contract, including those mandated by Section 21.3, were required to be in writing. Moreover, the parties agree that the notices constituted express conditions precedent to Westlake's right to enforce James's obligation to pay Westlake's excess costs incurred in transferring the work.[12]

James argues that strict compliance with express conditions precedent is required and that the jury's failure to find strict compliance as to the first two notices, along with Westlake's undisputed failure to strictly comply with the third, forecloses Westlake's right to recover. Alternatively, James argues that legally insufficient evidence supports the jury's findings that Westlake substantially complied with the three notice conditions. Westlake responds that under well-established Texas law, substantial compliance with a contract's notice requirements is sufficient to satisfy them. Westlake further argues that the evidence supports the jury's findings that Westlake substantially complied.

We hold that substantial compliance is the appropriate standard when evaluating whether a party complied with a contractual notice condition.[13] However, we also hold that substantial compliance with a condition precedent requiring written notice may not be achieved

---

[12] Other than the intervention provision (Section 17.2), discussed below, this is the sole provision on which Westlake relies to recover its costs incurred in changing contractors.

[13] We do not address whether substantial compliance is the appropriate standard for satisfying conditions precedent that do not involve notice.

without a writing in some form.[14]  Here, Westlake provided no writing at all with respect to at least two of Section 21.3's required written notices and thus failed to substantially comply with the provision's conditions as a matter of law.

### 1. Substantial Compliance and Written Notice

This Court has not had occasion to address whether some form of a "substantial-compliance doctrine" applies to contractual notice provisions like the one at issue here.  In a somewhat analogous context, we have applied a "notice–prejudice rule" in insurance disputes in which timely notice of a claim is a condition to a policy's coverage.  *See Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 375 (Tex. 2009).  Under that rule, which flows from the more general principle that "an immaterial breach does not deprive the insurer of the benefit of the bargain," "an insured's failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay." *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 631–32, 636 (Tex. 2008).  We applied the rule in *Prodigy*, in which the insured failed to give notice "as soon as practicable" after the covered incident, as the policy required, but did give notice within the policy's outer boundary of ninety days.  288 S.W.3d at 376–77.  We held that the

---

[14] Texas recognizes a distinct doctrine of "substantial performance," which allows a contractor that "has substantially performed a building contract . . . to recover the full contract price less the cost of remedying those defects that are remediable." *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 481 (Tex. 1984).  Our decision today does not address the application of that doctrine when the contractor fails to comply strictly with an express condition precedent requiring written notice.

insured's failure to meet the "as soon as practicable" requirement did not defeat coverage absent prejudice to the insurer, concluding that the requirement was not a "material part of the bargained-for exchange." *Id.* at 378, 382. In *PAJ*, we noted that requiring strict compliance with such provisions would have "draconian consequences for even *de minimis* deviations from the duties the policy places." 243 S.W.3d at 636.

The courts of appeals have more broadly applied the "doctrine of substantial compliance" to excuse "exactitude in the performance of contractual duties . . . where any deviations or deficiencies do not seriously impair the purpose underlying the contractual provision." *In re G.D.H.*, 366 S.W.3d 766, 771 (Tex. App.—Amarillo 2012, no pet.); *see also, e.g.*, *Burtch v. Burtch*, 972 S.W.2d 882, 889 (Tex. App.—Austin 1998, no pet.). In *G.D.H.*, for example, which involved an agreed custody-modification order, the parents agreed that if one of them intended to travel internationally with their child, that parent would give written notice to the other containing various details of the trip, and the other parent would then execute any necessary consent forms. 366 S.W.3d at 768. In reviewing an enforcement order rendered after the father refused to execute a consent form, the Amarillo Court of Appeals rejected the father's argument that his duty to execute had not been "triggered" because the mother's notice did not contain "each detail" required by the notice clause. *Id.* at 770–71. The court explained that although the notice was deficient in some respects, it contained "the bulk of the requisite information" such that "it would be unreasonable

to conclude that the trial court erred in holding [the mother] substantially complied with her duty." *Id.* at 771.

The Dallas Court of Appeals has similarly applied the substantial-compliance doctrine to notice requirements. In *Barbier v. Barry*, the court examined the effectiveness of a party's written notice of cancellation of a contract that, though undisputedly received by the other party, was not sent by registered mail as the contract required. 345 S.W.2d 557, 562 (Tex. App.—Dallas 1961, no writ). The court held that "the failure to send [the notice] by registered mail did not destroy its effectiveness as notice" and that the cancelling party substantially complied with the contract. *Id.* Similarly, in *Texas Utilities Electric Co. v. Aetna Casualty & Surety Co.*, the court of appeals held that Aetna substantially complied with a surety bond's cancellation requirements by sending the requisite written termination notice to Texas Utilities' office in Mesquite, where an authorized agent of Texas Utilities actually received the notice, despite the bond's provision that notice be sent to the company's office in Allen. 786 S.W.2d 792, 793 (Tex. App.—Dallas 1990, writ denied); *see also S. Tex. Elec. Co-op v. Dresser–Rand Co.*, 575 F.3d 504, 507 (5th Cir. 2009) (citing *Barbier* and *Texas Utilities* to hold that under well-established Texas law, "the doctrine of substantial compliance [applies] to contractual notice provisions").

We agree with the doctrine described and applied in these cases as a general principle of Texas law: a party's minor deviations from a contractual notice condition that do not severely impair the purpose underlying that condition and cause no prejudice do not and should not deprive that party of the benefit of its bargain. *PAJ*, 243 S.W.3d at 636;

23

*see also J.M. Davidson*, 128 S.W.3d at 229 ("[T]he primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."). Moreover, the doctrine serves the important purpose of preventing parties from engaging in bad-faith "gotcha" tactics to avoid their own contractual obligations based on a technicality. James cites various treatises and other secondary sources to support its contention that strict compliance with express conditions precedent is required, particularly in the construction context, but references no Texas law to that effect. Further, James dismisses our opinions in *P.A.J.* and *Prodigy* as limited to the insurance context, where unique policy concerns are presented. However, the reasoning in those cases and the purposes served by applying the substantial-compliance doctrine are not limited to a particular category or type of contract.

That said, while Texas law generally recognizes substantial compliance as a proper standard by which to evaluate satisfaction of contractual notice conditions,[15] we have found no Texas cases holding that a party's provision of oral notice complies, substantially or otherwise, with a requirement of *written* notice. Indeed, both our own precedent and that of the courts of appeals hold the opposite, and the

---

[15] Our holding regarding substantial compliance with contractual notice conditions should not be read to undermine well-established, black-letter legal principles regarding breach of covenants. Specifically, a party is subject to liability for a breach of contract that causes damages regardless of whether the breach was material. *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (explaining that while only a material breach excuses the other party from further performance, a nonmaterial breach that causes damages still gives rise to a cause of action for breach of contract).

24

results in those cases did not depend on whether the failure to provide written notice prejudiced the other party. We held over sixty years ago in *Shaller v. Commercial Standard Insurance Co.* that oral notice of an insurance policy's cancellation was insufficient in the face of a written-cancellation requirement, barring waiver of that requirement. 309 S.W.2d 59, 61, 64–66 (Tex. 1958). In arguing that it had effectively cancelled the policy, the insurer in *Shaller* relied on *Austin Fire Insurance Co. v. Polemanakos*, 207 S.W. 922 (Tex. Comm'n App. 1919, judgm't adopted), in which the court had held that oral notice of cancellation was sufficient. *Shaller*, 309 S.W.2d at 65. But we distinguished *Polemanakos* on several grounds, most notably including that the policy at issue in that case, unlike in *Shaller*, "had no provision for a written notice of cancellation." *Id.*

The courts of appeals have similarly held, in a variety of contexts including construction contracts, that oral notice does not satisfy a contract's written-notice requirement. For example, in *Emerald Forest Utility District v. Simonsen Construction Co.*, Emerald hired Simonsen to construct a sewer line that failed shortly after construction. 679 S.W.2d 51, 52 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Simonsen asserted that wet sand conditions caused the line failure and that it could not be held liable because it had notified Emerald of the problem and requested that the design be modified, but Emerald refused. *Id.* at 54. The Houston Fourteenth Court of Appeals acknowledged that had Simonsen given such notice in writing, it would have been relieved of liability under the contract. *Id.* But it was undisputed that Simonsen did not give written notice as the contract

required, and the court held that Simonsen had failed to comply with a condition precedent and so was not relieved of liability. *Id.* The Dallas Court of Appeals similarly held that a lessee could not show it had met conditions precedent to recovering for breach of contract where the contract mandated written notice of an alleged breach and all notices provided were oral. *Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 744–45 (Tex. App.—Dallas 2012, no pet.). Finally, in *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, the Houston First Court of Appeals addressed a construction contract's requirement that the owner, as a condition precedent to recovery for breach of warranty, provide written notice of any work it deemed defective and additional written notice, upon the contractor's failure to cure the defect, that the owner would repair the defect at the contractor's expense. No. 01-06-00535-CV, 2008 WL 3876141, at *18 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pet. denied). The court held that the contractor's "actual notice of defects" was insufficient in the face of a requirement that the notice be in writing. *Id.* at *20.

The courts' unfailing refusal to deem oral notice compliant with a contractual condition requiring written notice, like the doctrine of substantial compliance as a general matter, is consistent with our repeated affirmation that "[a]bsent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017) (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)). The bargained-for requirement of written notice necessarily serves a purpose beyond actual notice; otherwise, its

26

inclusion is useless.  *See Shaller*, 309 S.W.2d at 66; *Emerald Forest*, 679 S.W.2d at 54 (holding that actual notice does not overcome the absence of written notice).  For one thing, a writing eliminates after-the-fact disputes about exactly *what* notice was given.  Parties may still disagree about whether a writing is sufficient, but unlike with an alleged oral conversation, they cannot disagree about what has actually been said.  For another, in the context of large-scale contracts like the one at issue here, involving millions of dollars and significant consequences in the face of termination under certain circumstances—such as responsibility for excess costs incurred in completing the project—a party should not have to guess whether those consequences are being triggered in the absence of a writing when one is required.

We long ago highlighted the significance of a statutory written-notice requirement in *Berry v. McAdams*, in which we examined the mechanic's lien statute's requirement of written notice to the property owner as a prerequisite to a materialman's enforcing such a lien.  55 S.W. 1112, 1114 (Tex. 1900).  We explained that "[t]he policy of the law is to relieve the owner from demands upon the ground of actual knowledge and constructive notice, because he could rarely defend himself from such claims."  *Id.*  Accordingly, we rejected the materialman's argument that written notice was not required when the owner had actual knowledge of the claim, explaining that "[w]ritten notice is certain and definite information upon which the owner must act."  *Id.*; *see also Moore v. Brenham Ready Mix, Inc.*, 463 S.W.3d 109, 114–16 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (holding that actual notice of a lien claim did not qualify as substantial compliance

with the mechanic's lien statute's requirement of "timely written notice"). Westlake summarily dismisses such precedent as "inapposite cases involving what constitutes substantial compliance in the context of statutory requirements for perfecting a lien." But while the context is different, our recognition of the significance of a writing requirement is not so limited. As such, Texas law has addressed the specific issue presented here: whether in the face of a contractual written-notice requirement, oral notice can suffice.

CHIEF JUSTICE HECHT's dissent, however, suggests that guidance from the Fifth Circuit is necessary, glossing over this Court's strong language on written notice in *Shaller*. *Post* at ___. The fact that *Shaller* involved cancellation of an insurance policy and discussed the timing of the notice as well as its form does not diminish its central holding: where the provision at issue requires written notice, unless "a notice in writing [is] waived . . . an oral notice, insufficient in law when given, [can]not mature into an effective cancellation of the [policy]." 309 S.W.2d at 66. In other words, absent waiver, oral notice does not satisfy a written-notice requirement as a matter of law. *Id.*

Moreover, even if state law had not definitively addressed the issue, the Fifth Circuit has not either. While we wholeheartedly agree that the Fifth Circuit offers useful (and appreciated) guidance on matters of state law that Texas jurisprudence has not yet addressed, federal law does not fill in the purported gap here. Notwithstanding the dissent's assertion that the Fifth Circuit answered the question presented here in *South Texas Electric*, it simply did not.

28

To begin with, we do not disagree with *South Texas Electric*. On the contrary, we agree with the Fifth Circuit's conclusion that Texas law recognizes the doctrine of substantial compliance with respect to written-notice conditions, as we have articulated above. *S. Tex. Elec. Co.*, 575 F.3d at 507. However, we part ways with the dissent's reading of *South Texas Electric* as it relates to whether substantial compliance is possible when no writing has been provided. In that case, Texas Electric hired Dresser to install a steam turbine, which Dresser warranted to repair if there were defects. *Id.* at 506. The warranty required Dresser to repair defects after receiving written notice from Texas Electric and allowed Texas Electric to remedy the defects itself if it provided Dresser ten days' written notice. *Id.* The turbine experienced problems "immediately following its installation." *Id.* Texas Electric notified Dresser of the issues "early on," but over the course of the next two years Dresser failed to make repairs. *Id.* During that time, Texas Electric hired a third party to conduct tests, of which Dresser was "aware" and agreed to cover the costs. *Id.* Texas Electric subsequently hired another third party to repair the turbine "without providing Dresser *further* written notice." *Id.* (emphasis added). The opinion's description of the background facts reveals that writings were involved. *See id.* (stating that Texas Electric "wrote" to Dresser about the tests and that the repair work was done without "further written notice"). As such, the court's focus was *not* on the lack of a writing, and the opinion does not offer definitive guidance thereon.

Therefore, we hold that, barring waiver, when a contract requires written notice as a condition precedent to the right to enforce an

obligation under the contract, substantial compliance with that requirement may not be achieved in the absence of a writing. With the proper standard enumerated, we turn to the evidence of the contractual notice required and provided in this case.

## 2. Application to Westlake's Notices

Westlake was required to give James three notices in order to terminate James for default under Section 21.3 and recover excess costs associated with the termination: (1) notice that Westlake had determined in its reasonable opinion that James had serious safety violations; (2) notice that Westlake was not reasonably satisfied with the pace and quality of James's remediation effort (which James was required to undertake within seventy-two hours of the first notice); and (3) notice that Westlake had elected to terminate the contract or a portion of the work. Each of those notices was expressly required to be in writing. At best, only the first one was.[16]

As noted, on December 28, 2012, following the Price incident, Westlake's project manager (Kuo) forwarded an email from Westlake VP Kenner to other Westlake employees and cc'd DeBarge, James's site manager. Kenner's email stated that the incident was "completely preventable" and discussed having a safety review with James—which subsequently occurred on January 2—to "show us how" it would prevent

---

[16] With respect to the first two notices, the jury failed to find that Westlake gave written notice in strict compliance with the contract. This could mean the jury concluded there was no writing at all, or it could mean the contents of the writing were deemed insufficient to amount to strict compliance.

30

such incidents from happening again. Kuo added, "We have to develop preventive safety mind set [sic] with some extraordinary measure[s] on job safety." As James notes, the email did not mention Section 21.3, default, "serious safety violations," the commencement of a seventy-two-hour window for James to begin remediation efforts, or a warning about termination for default if those efforts were deemed insufficient. Westlake points to no other written communications relevant to the first notice requirement.

While Section 21.3 does not require the use of specific words, certainly the notice needed to communicate sufficient information to enable James to reasonably conclude that the section was at play and that the seventy-two-hour clock was ticking. Given the seriousness of the incident, Westlake understandably raised concerns about safety measures and the need to focus on preventing future incidents and injuries. But expressing safety concerns does not necessarily equate to triggering Section 21.3. At trial, when Kenner was asked when the seventy-two-hour period for James to begin remediation under that section began, he testified:

> A.    Again, this is the one – we've acknowledged we don't have as many written notices here. You've got several notices. We've got – you have to go through your e-mail chain. So there's a notice on a couple e-mails where James personnel are included in the e-mail. So, clearly, you can say a 72-hour period started at that time. But we're not using the word "notice," and we're not using the word "default." We are talking about serious safety violations.
>
> Q.    And you're saying there's no – so you can't testify to this jury when that 72-hour period began, can you, sitting here today, can you?

31

A.     No.   We met with them multiple, multiple times.

Q.     You met with them?  The 72 hours called for in the notice provision, you can't tell this jury when that clock started to run?

A.     It was, you know – Rusty [DeBarge]'s office from our people was, like, past the men's room, three offices down on the left.  So they were going down and talking –

[Attorney]: Objection.  Nonresponsive.

A.     No, I cannot testify.

If Westlake could not determine from the various communications when the seventy-two-hour period under Section 21.3 began, we fail to see how James could reasonably be expected to do so.  Thus, although Kuo's email characterized the incident as "preventable" and stressed the need to develop additional safety procedures, we find it questionable whether the email qualified as the requisite first notice under Section 21.3.

Even if it did, *see City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review"), two more written notices were required and were not provided.  As to the second notice—that Westlake was not reasonably satisfied with the pace and quality of James's remediation effort—Westlake points to the January 18, 2013 email from Kuo to DeBarge, which was a response to DeBarge's email addressing rumors that Westlake was considering assigning offsite EDC and pipeline work to another contractor.  Kuo's email stated:

32

Dear Rusty:

Thanks for the email.

I agree[] that in this project we have done many good things and set up very good programs from safety, cost/productivity control measures to all procedural systems for a well executed project; and a lot of credit[] has to go to [James] and its demonstrated willingness to work on Westlake CA [chlor-alkali] project.

I also agree[] that we all would like to be judged by our intentions and efforts; we are in fact judged by the results. And the results / final judgment has yet to come which only due [sic] when we have completed and started up the project safely and successfully without any more serious safety incident[s].

The intent of the decision to introduce possible [sic] another contractor to take care of EDC and Pipeline jobs is to help ensur[e] Westlake / [James] will be successful in the CA project. Never intended to wipe out what [James] has been doing well for the project thus far especially the areas mentioned by your E mail below.

We all make mistakes and we all need to learn from it and our responsibilities as leader[s] includes take [sic] proactive action(s) deem[ed] necessary preventing [sic] re-occurrence; besides what we have implemented of safety enhancements after the incident, separating out independent jobs such as EDC and pipelines is what I see necessary so that we can avoid, as you have said it, "This attention level does have the potential to affect our efforts within the plant boundaries. For this reason, I [DeBarge] do not see a negative effect on the project if those scopes of work were given to another contractor."

I trust that you understand where I am coming from and will have your continued supports [sic] and commitment as an individual and as a company working together with Westlake, CDI, and other potential contractors as a team for a safe and successful project.

33

In this email, Kuo praised James's progress on safety, stated that the "final judgment" on safety "has yet to come," and explained why Westlake had decided to give EDC and pipeline work to another contractor—which it was undisputedly entitled to do under Section 1.2 of the contract.[17]  As with the first notice, this email did not mention Section 21.3, default, or termination.  Nor did it say more generally that Westlake was not reasonably satisfied with the pace and quality of James's remediation effort.  If anything, it seemed to express Kuo's opinion that the two companies were both doing what was necessary to ensure a "safe and successful project."

That conclusion is consistent with Kuo's trial testimony that James's safety performance temporarily improved in January 2013.  It is also consistent with evidence showing that in February, Westlake assigned James $10,000,000 in additional mechanical, civil, and installation work on the project.  An internal Westlake document from the "CA Project Team" requesting management approval for the additional work stated that "[b]ased on James's performance, improved safety programs, quality of work completed, and meeting current construction schedule, the CA Team recommends continuing to issue work order [sic] based on the T&M [Time & Materials] base rate to James Construction for Phase IV of the chlor-alkali project."  Based on the substance of Kuo's January 18 email and Westlake's subsequent

---

[17] Westlake has never alleged that excess costs associated with its assignment of mechanical work to Turner before April 11 are recoverable as damages under Section 21.3.  Nor has James ever alleged that Westlake breached the contract by giving Turner such work.

actions, the email provides no indication that Westlake was dissatisfied with James's efforts, let alone that the circumstances had progressed to the point that Westlake had determined it had the right to terminate James for default and recover any excess costs incurred in completing the project.

To be sure, internal Westlake communications reflect Westlake's renewed concern with James's safety record, with Kenner going so far as to say on March 6, well after the January 18 email on which Westlake now relies, that "I think we need to let James Construction know that we are considering removing them from the job and putting them on notice." But again, Westlake fails to cite evidence showing that it followed through on that plan, and the email reflects Westlake's opinion that James was *not* "on notice" at that time. Indeed, on March 22, Kenner identified a recent safety audit indicating that "James has stepped up their safety monitoring and performance." In light of all this evidence, the January 18 email cannot qualify as the second required notice under Section 21.3, and Westlake identifies no other writing that can.

Finally, it is undisputed that Westlake did not provide the third requisite written notice: that it had elected to terminate the contract or a portion of the work for James's default.[18] Internal Westlake emails

_____

[18] On March 21, Westlake informed James via email that some additional mechanical work would be transferred to Turner as of April 15. However, the email further stated that the plan was to focus James's efforts on a specific area "in an effort to meet our current end date" and that the transfer of work "is not an indication of your efforts to date. A noticeable

35

indicate that on April 2, following an onsite incident the previous day that resulted in a broken finger, Westlake made the decision to transfer the remaining mechanical work to Turner because James had failed "to improve their safety performance" and was "continuing to fall further behind in their schedule." On April 11, Westlake and James had a meeting at which, according to Campbell, he told James's representative that James was "falling back into the same pattern" with respect to safety and instructed him "to get your remaining piping and mechanical people off the job." Campbell and Kuo both testified at trial that safety was the primary reason for transferring the remaining mechanical work to Turner. Westlake sent no letter, email, or other writing to James memorializing the actions taken at the meeting.

As Westlake points out, there is no dispute that James ceased all mechanical work after the April 11 meeting.[19] Westlake thus contends that the lack of a written termination notice is immaterial because James's actions demonstrate it knew that it had in fact been terminated. However, as explained, actual notice is not a substitute for written notice.[20] Moreover, the contract allowed Westlake to assign work to

_____

change in your staff, field supervision, and craftsman is clearly vi[si]ble." Moreover, Westlake has never alleged that this email constituted either a default notice or a termination notice. And again, Westlake has never alleged that James is responsible for costs associated with work assigned to Turner before the April 11 meeting.

[19] As noted, Westlake did not transfer any of the civil work that had been assigned to James, and James completed that scope of work.

[20] Westlake presented evidence that James VP Conrad Bourg lost his temper at the meeting and complained that Westlake was penalizing James

other contractors as it saw fit, and the contract could also be terminated for any number of reasons. Only termination for default under Section 21.3, however, triggered James's obligation to pay "[a]ny extra costs in excess of the Contract Price incurred by [Westlake]" in completing the work. Again, James was entitled to the requisite written notice that would give rise to that obligation, but no such notice was given.[21]

CHIEF JUSTICE HECHT'S dissent focuses on two writings to support the conclusion that Westlake provided the requisite notice: (1) the December 28 email in which Westlake expressed safety concerns; and (2) the January 18 exchange between DeBarge and Kuo. Neither supports the dissent's position.

As discussed above, while the December 28 email expresses a belief that there were safety problems, it did not mention Section 21.3, default, the commencement of a seventy-two-hour window for James to begin remediation efforts, or a warning about termination for default if those efforts were deemed insufficient. But assuming that email satisfies the first notice requirement, no writings satisfy the second or third. Contrary to the dissent's description, not only does the

_____

even though "[e]very contractor has fatalities." Such comments are certainly distasteful and hurtful, but they do not demonstrate that Westlake provided the requisite notice of termination for default under Section 21.3.

[21] James cites DeBarge's testimony that James would have reacted differently had it known that Westlake considered James to be in default or indicated that it would terminate the contract for that reason. The jury appears to have rejected this testimony given its finding that James was not prejudiced by the form of notice. Regardless, as explained, when written notice is required, lack of prejudice does not override the absence of a writing.

37

January 18 email from Kuo express no dissatisfaction with James's safety efforts; it *commends* James on its progress in that regard. Finally, the absence of a third written notice is uncontroverted. That is, Westlake undisputedly never provided James with written notice that James was actually terminated from the project for default. The dissent's suggestion that *James's* writing—its email to Westlake after the April meeting acknowledging that James had discontinued its mechanical work on the project—can satisfy *Westlake's* obligation to provide notice to James turns the notice provision on its head. While this communication may serve as some evidence that James had actual notice of its termination, it does nothing to satisfy Westlake's obligation under Section 21.3. Moreover, it is doubtful that the email even reflected actual notice of termination. Since Westlake had discretion to allocate work to other contractors without terminating the contract, James's acknowledgment that it had discontinued mechanical work does not equate to an acknowledgment that it had been terminated for default.

In sum, because the contract required Westlake to give three written notices as conditions precedent to the right to enforce James's obligations under Section 21.3, and because at least two of those notices were not given, James had no obligation to pay Westlake's excess costs, and the jury's award of breach-of-contract damages under that provision cannot stand. In so holding, we give effect, as we must, to the contractual language the parties chose.

## B. Intervention Under Section 17.2

Westlake argues that even if it is not entitled to the $1,054,251.81 in contract damages the jury found for James's failure to comply with Section 21.3, the trial court's judgment awarding Westlake those damages may nevertheless be upheld because the jury independently awarded the same amount for James's failure to comply with Section 17.2, which contains no "notice" requirement. That section, entitled "Intervention," states:

> Company [Westlake] shall at any time during the execution of the Work by Contractor [James] have the right to intervene in any appropriate way, if in the reasonable opinion of Company, . . . (c) Contractor is performing its duties under this Contract in an unsafe way or manner in which [sic] Company believes may cause injury or damage to persons or property. In such cases Company shall have the right to require Contractor to immediately take remedial action to the satisfaction of Company. Contractor shall be solely accountable for all costs associated with such intervention and remedial action, whether incurred by Contractor, Company or any third party.

Westlake contends that pursuant to this provision's authorization "to intervene in any appropriate way," it "intervened by trying to get James to improve its safety performance and then, when James's safety did not improve, informing James that Westlake would be transitioning the remainder of James's mechanical work to Turner." James responds that Section 17.2 allows Westlake to require James to take remedial action and bear the associated cost, but it does not provide a mechanism to terminate any portion of the work and shift the cost of hiring replacement contractors to James. If it did, James contends, then Section 21.3 does nothing. We agree with James.

39

Section 17.2 broadly allows Westlake to intervene "in any appropriate way," but it goes on to focus on Westlake's authority to require *James* to take remedial action and bear the cost, and it implies that those costs will be incurred "during the execution of the Work," not later. Even if Westlake is authorized to intervene in other ways, Section 17.2 does not purport to encompass terminating the contract or any portion of the Work. To the contrary, the contract details very specifically how work is to be terminated, and construing the intervention clause as Westlake does improperly reads those provisions away entirely. *See J.M. Davidson*, 128 S.W.3d at 235 ("Contracts are to be read as a whole, and an interpretation that gives effect to every part of the agreement is favored so that no provision is rendered meaningless or as surplusage."). As discussed above, Section 21.3 allows Westlake to terminate James for default for "serious safety violations" and to recover the costs associated with hiring another contractor to complete the work, but only after satisfying specific notice requirements and giving James an opportunity to engage in remediation efforts. If Section 17.2 authorizes recovery of those same costs, but without the required notice and opportunity to cure, then as James argues, there would be no reason to invoke Section 21.3 at all because "intervening" would be far easier. In other words, Section 17.2 would swallow Section 21.3 entirely.

In sum, we do not interpret Section 17.2 as allowing an end-run around the more stringent requirements to terminate for default and recover costs under Section 21.3. Accordingly, the jury's award of damages for James's failure to comply with Section 17.2 cannot stand

and thus does not serve as an independent basis for upholding a portion of the court of appeals' judgment.

## C. Indemnity Provision

Although most of the contract damages awarded to Westlake—$1,054,251.81—do not survive the above analysis, Westlake was also awarded $102,767.69 in damages for James's failure to comply with Section 19.1, the indemnity provision. As noted, those damages consist of litigation costs Westlake incurred in defending the Price litigation. James argues that Westlake's improper termination of James for default under Section 21.3 constituted a prior material breach of the contract that excused James's continued performance, including satisfying its obligations under the indemnity provision. The court of appeals rejected this argument, as do we.

As James itself argues, the notice provisions in Section 21.3 were conditions precedent, not covenants. A covenant "is an agreement to act or refrain from acting in a certain way." *Solar Applications*, 327 S.W.3d at 108. A breached covenant gives rise to a cause of action for damages, and a *material* breach excuses the other party from performance. *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." (citation omitted)). By contrast, a "condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation," and "if an express condition is not satisfied, then the party whose performance is conditioned is excused from any obligation to

perform." *Solar Applications*, 327 S.W.3d at 108. The contract gave Westlake the right to terminate the contract for any reason it chose and, even in the absence of termination, to assign work to any contractor it chose. But James's obligation to pay Westlake the excess costs it incurred in doing so was conditioned on Westlake's satisfying Section 21.3's written-notice requirements. Because Westlake failed to do so, as discussed above, it may not enforce James's obligation to pay those costs.

However, this did not excuse James from complying with other provisions of the contract. That is, Westlake's failure to provide the requisite notice did not constitute a material (or nonmaterial) breach of the contract that "affect[ed] the enforceability of the remaining provisions." *Id.* Again, as James itself argues, Westlake had authority to reassign the work without terminating James at all, let alone for default. And James's primary position is that it was not terminated but simply removed from the mechanical work. Indeed, after purportedly being "wrongfully terminated," James was paid for its mechanical work and continued to perform civil work under the same contract. While we do not disagree with the general principle that wrongful termination of a contract can constitute a material breach, *see, e.g.*, *STR Constructors, Ltd. v. Newman Tile, Inc.*, 395 S.W.3d 383, 388 (Tex. App.—El Paso 2013, no pet.) (holding sufficient evidence supported the jury's finding that STR materially breached by terminating the contract without proper cause), that principle does not apply here because noncompliance with a condition precedent simply precludes the noncomplying party from enforcing its conditional right. Westlake's actions foreclose its

entitlement to recover under Section 21.3, but they do not amount to a material breach of the contract excusing James from all further performance.[22]  We therefore hold that the court of appeals properly affirmed the portion of the trial court's judgment awarding Westlake damages for James's failure to comply with Section 19.1.

### D. Section 26: Waiver of Consequential Damages

The parties agree that under Section 26 of the contract, neither party is liable for consequential damages.  The issue presented is whether Section 26 also contains a covenant not to sue for such damages, such that it may provide the basis for a breach-of-contract claim.  Taking the position that it does and that Westlake "made claims against James for consequential damages as expressly prohibited by Section 26," James counterclaimed for breach of contract.  As noted, the jury found that Westlake failed to comply with Section 26 and awarded James damages for its "reasonable and necessary attorney's fees" incurred "in defending against any consequential damages."  The court of appeals reversed the trial court's judgment on that portion of the verdict, holding that Section 26 only waived liability for consequential damages and did not give rise to a contractual obligation not to sue for such damages.  594 S.W.3d at 766.

Section 26 provides:

WAIVER OF CONSEQUENTIAL DAMAGES

Neither [Westlake] nor [James] shall be liable to the other
for any consequential, incidental, indirect or punitive

---

[22] For the same reason, we reject James's assertion that it is entitled to judgment as a matter of law on its Section 21.3 counterclaim.

43

damages . . . arising under this Contract or as a result of, relating to or in connection with the Work and no claim shall be made by either [Westlake] or [James] against the other for such damages REGARDLESS OF WHETHER SUCH CLAIM IS BASED OR CLAIMED TO BE BASED ON NEGLIGENCE OR STRICT LIABILITY (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT NEGLIGENCE OR GROSS NEGLIGENCE) OR ANY OTHER THEORY OF LEGAL LIABILITY, AND INCLUDING PRE-EXISTING CONDITIONS BUT EXCLUDING GROSS NEGLIGENCE AND WILLFUL MISCONDUCT.

James argues that Section 26 constitutes a clear covenant not to sue because it plainly states, in an independent clause, that "no claim shall be made" for consequential damages. Westlake responds that the provision clearly functions solely as a waiver of consequential damages that prevents a party from recovering them, not a covenant not to sue that prohibits a party from seeking certain damages merely because a court may ultimately conclude that they are consequential. We agree with Westlake.

First, we have held that "headings and titles provide context and can inform the meaning of the sections they label," and that "[g]enerally, courts should construe contractual provisions in a manner that is consistent with the labels the parties have given them." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015). The title of Section 26 is simply "Waiver of Consequential Damages," not "Waiver of Consequential Damages and Covenant Not to Sue" or words to that effect.

Second, while "no claim shall be made" is contained in an independent clause from "[n]either [party] shall be liable," it is followed

44

by language clarifying its scope: "no claim shall be made . . . for such damages regardless of whether such claim is based or claimed to be based on negligence . . . or any other theory of legal liability . . . excluding gross negligence and willful misconduct." (Capitalization removed). Thus, the parties have relinquished a claim to any consequential damages to which they might be entitled in the event of a lawsuit, which the paragraph explicitly contemplates; they have not relinquished the right to bring a suit in the first place. We therefore disagree with James's contention that limiting Section 26 to a waiver renders any of its language superfluous. Indeed, if anything, construing the second clause as a covenant not to sue for consequential damages— such that it prevents a claim for consequential damages in the first place—renders the language waiving liability for such damages superfluous.

Third, the nature of the purported covenant not to sue informs our discussion. *See Dillon Gage Inc. of Dall. v. Certain Underwriters at Lloyds Subscribing to Policy No. EE1701590*, 636 S.W.3d 640, 643 (Tex. 2021) ("We determine the parties' intent through the terms of the [contract], giving words and phrases their ordinary meaning, informed by context."). As Westlake notes, none of the cases James cites involve covenants not to sue for consequential damages, and we have been unable to locate any. Rather, such covenants typically foreclose a party from bringing suit at all[23] or, more commonly, from asserting causes of

---

[23] *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 765 n.1 (Tex. 1964) ("[W]e, the undersigned, do hereby covenant and agree not to sue, make

45

action arising from or related to specific incidents—often incidents that were the subject of a prior, settled lawsuit.[24] When those types of covenants are at issue, whether a party has brought a prohibited suit or claim is fairly discernible from the outset of the litigation. That is not the case with an agreement not to sue for consequential damages given that legitimate disputes often arise, as they did in this case, regarding whether contractual damages sought are properly classified as "direct" or "consequential." *See, e.g.*, *San Antonio River Auth. v. Austin Bridge & Road, L.P.*, 601 S.W.3d 616, 630–31 (Tex. 2020); *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 373–74 (Tex. 2019). Indeed, the line between direct and consequential damages often is not a bright one.[25] Thus, a party seeking damages that it believes in

---

claim, or institute any action or proceeding directly or indirectly against [the other parties] to recover damages of any kind or character.").

[24] *Robertson v. Trammell*, 83 S.W. 258, 260 (Tex. App. 1914, writ ref'd) ("[Plaintiff] hereby agrees and covenants never to make the matters and things set out and the circumstances described in plaintiff's petition herein, the basis of a suit against said defendant in any court, and never to bring or to maintain an action because thereof against said defendant."); *Pape Equip. Co. v. I.C.S., Inc.*, 737 S.W.2d 397, 400–01 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) ("[Dow] agrees and covenants not to sue, claim or make claims or institute any action or proceeding directly or indirectly against I.C.S., Inc. . . . to recover damages of any kind or character, . . . received in or resulting from . . . [a specific] accident . . . ."); *Leong v. Wright*, 478 S.W.2d 839, 840 (Tex. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.) (describing the covenant at issue as an agreement not to "institute any action or proceeding" against the other party "for any damages which may have resulted to the plaintiffs from the incident made the basis of the suit").

[25] We recently reiterated that direct damages "'are the necessary and usual result of,' and 'flow naturally and necessarily from'" a contractual breach, while "consequential damages 'result naturally, but not necessarily,' from the

good faith, but ultimately incorrectly, are direct rather than consequential will not know whether it is in breach by asserting a claim until the nature of the claim has been determined on the back end of the suit.[26]

That appears to be exactly what happened here. Westlake alleged that James breached various sections of the contract and sought to recover its "actual damages." The parties litigated whether a portion of the costs Westlake sought qualified as (recoverable) direct damages or (unrecoverable) consequential damages, and James obtained favorable rulings as to some of those costs. If Section 26 contains a covenant not to sue, the consequence of Westlake's taking an erroneous, but by no accounts frivolous, position on the nature of its claimed damages is that it has breached the contract by even making the argument. While parties are free to agree to that consequence, however unusual or impractical, we do not read Section 26's plain language to reflect that intent here.

Because Section 26 waives liability for consequential damages but is not a covenant that Westlake breached by seeking damages that were determined to qualify as consequential, the court of appeals

---

defendant's breach, and are not 'the usual result of the wrong.'" *Vizant Techs.*, 576 S.W.3d at 373 (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)) (emphasis removed). This distinction is not always so easily applied in practice.

[26] Of course, if consequential damages are barred and a party seeks to recover them in bad faith or by making groundless and frivolous arguments, it is subject to sanction like any other party who asserts a frivolous claim. *See* TEX. CIV. PRAC. & REM. CODE §§ 10.001–.002; TEX. R. CIV. P. 10.

properly rendered judgment that James take nothing on its counterclaim.[27]

## E. Attorney's Fees

What remains of the trial court's judgment is an award to Westlake of (1) $102,767.69 in damages for James's failure to comply with the contract's indemnity provision and (2) $2,923,600.50 in attorney's fees, plus conditional appellate fees. As Westlake is a prevailing party and was awarded damages on a breach-of-contract claim, it is entitled to recover its reasonable attorney's fees under Civil Practice and Remedies Code Section 38.001. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004). However, in light of the significantly reduced damages award and the fact that the jury's award of attorney's fees was based in part on the "results obtained," the part of the trial court's judgment awarding Westlake its attorney's fees cannot stand, and the court of appeals erred in affirming it. *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006) (reversing an award of attorney's fees and remanding for further proceedings because of the significant appellate adjustment to the amount of damages awarded). Accordingly, we reverse the court of appeals' judgment as to Westlake's attorney's fees and remand to the trial court for further proceedings.

---

[27] Westlake argues that several independent grounds exist to uphold this portion of the court of appeals' judgment, but we need not address those arguments.

### III. Conclusion

We hold that Westlake did not comply with the written-notice procedure under Section 21.3 of the contract and thus failed to satisfy conditions precedent to its right to recover damages for James's failure to comply with that provision. We further hold that Westlake may not recover those same damages under Section 17.2. However, Westlake is entitled to recover damages for James's breach of Section 19.1 because Westlake's failure to satisfy Section 21.3's notice requirements did not constitute a prior material breach. Finally, we hold that Westlake did not breach Section 26 by making a claim for consequential damages because that provision waives liability for such damages but does not contain a covenant not to sue. We affirm the judgment of the court of appeals in part, reverse it in part, and remand the case to the trial court for further proceedings on Westlake's attorney's fees.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** May 20, 2022

49