COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| STR CONSTRUCTORS, LTD. and ARCH INSURANCE COMPANY, | § | No. 08-10-00210-CV |
| | § | Appeal from the |
| Appellants, | § | 225th District Court |
| v. | § | of Bexar County, Texas |
| NEWMAN TILE, INC., | § | (TC# 2005-CI-04950) |
| Appellee. | § | |

## **O P I N I O N**

In this breach-of-contract action between STR Constructors, Ltd. (STR), a general contractor, and Newman Tile, Inc. (NTI), a subcontractor, the trial court rendered judgment for NTI and against STR and its insurer, Arch Insurance Co (Arch). In six issues, STR and Arch appeal from the trial court's judgment, contending that the evidence is legally insufficient to support the jury's findings that STR breached the contract and breached it first and to support the jury's award of damages, *quantum meruit*, and attorney's fees.[1] Because we conclude that the evidence is legally sufficient, we affirm.

### **FACTUAL AND PROCEDURAL BACKGROUND**

STR was hired by the Northeast Independent School District (the district) to renovate one of its middle schools. One of the spaces to be renovated was the school's kitchen.[2] As the general contractor, STR solicited bids for the installation of tile in the kitchen. After reviewing

---

[1] For the sake of convenience and simplicity, we will refer to both Appellants as STR throughout this opinion.
[2] The exact size of the kitchen was never ascertained. However, it was a large space and both parties testified that it was at least 3,000 square feet. According to Newman, the kitchen was "around 4,000 square feet." Jim Brown, STR's construction manager to the project, estimated that kitchen was 3,500 square feet.

1

the architectural plans and the specifications book, NTI tendered its bid. As the low bidder, NTI was awarded the contract.

Problems arose between STR and NTI during the renovation of the school. According to Harold B. Newman, owner and president of NTI, "[t]he project was . . . far behind" at the time NTI was scheduled to begin installing tile in the kitchen. In Newman's mind, the project was behind because STR failed not only to adhere to the schedule it had created, but also to design the schedule properly in the first place. On the other hand, STR blamed the delays on NTI's failure to supply a workforce adequate and skilled enough to install the tile properly and in a timely manner.

Tensions escalated when an issue surfaced concerning epoxy grout. STR maintained that epoxy grout was required to install the quarry tile in the kitchen and that the specification book made this clear. Newman disputed STR's contention and insisted that NTI's bid excluded epoxy grout. STR ordered NTI to use epoxy grout. Under protest, NTI ordered the epoxy grout and used it to install the quarry tile in the kitchen. Claiming that the epoxy grout and the labor necessary to install it were not within the scope of the contract, NTI submitted a change order to STR seeking reimbursement. STR never paid the change orders related to the epoxy grout nor did it pay change orders for work performed by NTI alleged to have been outside the scope of the contract.

As a courtesy, the district scheduled a walk-through of the kitchen. At the inspection, district officials informed Newman and representatives from STR that the kitchen, including its tile work, would not be accepted. In response, STR ordered NTI to make the necessary repairs, and to do so quickly. Becoming increasingly dissatisfied with one another's expectations, the parties wrote each other several letters outlining their respective positions. The correspondence

2

between the parties reveal that STR was growing increasingly dissatisfied with the work, or lack thereof, performed by NTI, so much so that one week after the inspection, STR informed NTI that STR was terminating the contract. NTI then sued for breach of contract and *quantum meruit*, alleging that STR's mismanagement made it impossible for NTI to perform on the contract.

## BREACH AND FIRST TO BREACH

In its first and second issues, STR argues that the evidence is legally insufficient to support the jury's findings that STR breached the contract and that STR breached the contract first. We disagree.

### *Standard of Review*

To determine whether the evidence is legally sufficient to support the jury's findings, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). If more than a "scintilla of evidence" exists to support the jury's findings, it is legally sufficient. *Id*. at 822. More than a "scintilla of evidence" exists when the evidence supporting the finding, as a whole, would enable reasonable and fair-minded people to differ in their conclusions. *Id*. As the sole judge of the weight and credibility of the evidence, the jury is entitled to resolve any conflicts in the evidence and to choose which testimony to believe. *Id.* at 819. We therefore assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id*. at 819, 820. Accordingly, we do not substitute our judgment for that of the jurors if the evidence falls within this zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822.

### *Applicable Law*

3

A party breaches a contract when he fails to perform an act that he has expressly or impliedly promised to perform. *Examination Mgmt. Svcs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 844 (Tex.App.--Dallas 2012, no pet.). If the breach is material, the other party is discharged or excused from further performance. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 198 (Tex. 2004). Whether a party's breach is so material as to render the contract unenforceable is ordinarily a question of fact to be determined based on several factors. *Id*. at 199. Some of these factors significant in determining whether a failure to perform is material include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Mustang Pipeline Co., Inc.*, 134 S.W.3d at 199, *citing* RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981).

### *Discussion*

### 1. Wrongful Termination

NTI alleged in its pleadings that STR breached the contract by wrongfully terminating the contract. The contract permitted STR, at its option, to terminate the contract "[s]hould [NTI] at any time . . . *fail in any respect to prosecute the work covered by this contract with promptness and diligence, or fail in the performance of any of the agreements herein contained . . . .*"[3] [Emphasis

---

[3] In its entirety, the paragraph in question reads:

4

added].  One of the agreements contained in the contract required NTI to "furnish and pay for all labor, services and materials and perform all of the work necessary or incidentally required for the completion of that part of the work covered by the Contract Documents . . . ."

On appeal, STR argues that it properly exercised its right to terminate the contract because "NTI alone breached the contract and [NTI] breached first by performing" work so defective that it was rejected completely by the owner and architect following their inspection of the kitchen. Accordingly, STR maintains that terminating the contract was not wrongful, but in accord with the contract "and [that] [its actions] therefore could not constitute a breach, much less a first breach." STR thus asserts that the terms of the contract and the rejection of NTI's tile work by the owner and architect "conclusively establish that [its] termination of NTI was not a breach of the [contract]."  In essence, STR contends that it was excused in terminating the contract because the rejection of NTI's tile work proved that NTI alone breached the contract by *failing to prosecute the work with promptness and diligence and to perform all of the work necessary to complete the kitchen*.

The evidence adduced at trial was legally sufficient for the jury to conclude that STR materially breached the contract and did so first by terminating it without cause.  Newman testified that when NTI was scheduled to begin installing tile in the kitchen, "[t]he project was very far behind."  Steven Latimer, the architect serving as the district's representative to the project, acknowledged that the project fell behind schedule and remained so before the tile work began in

Should Subcontractor at any time refuse or neglect to supply a sufficient number of properly qualified workmen or a sufficient quantity of materials of proper quality, or abandon the work or fail in any respect to prosecute the work covered by this contract with promptness and diligence, or fail in the performance of any of the agreements herein contained, Contractor may, at its option, after forty-eight (48) hours notice to Subcontractor, provide any such labor and materials and deduct the cost thereof from any money then due or thereafter to become due to Subcontractor under this contract or otherwise; or Contractor may, at its option, terminate this contract . . . ."

the kitchen. According to Bill Frost, the construction manager for the district, the project was behind schedule and he attributed the delay to STR. Newman also testified that STR failed to adhere to the schedule that it had created to get the project back on track and to schedule the work in the kitchen properly to ensure its timely completion, causing further delays in the installation of the tile. According to Newman, the kitchen floor was not prepared for the tile installation at the scheduled time because STR improperly scheduled different trades to work in the kitchen while NTI was attempting to set the tile. As a result, NTI had to redo its work constantly because STR permitted its employees and employees of other subcontractors to walk over and damage the newly-installed tile. Ray Banks, one of the tile setters employed by NTI, testified as to his and his coworker's frustrations in having to constantly redo tile and grout work because other tradesmen were walking on the floor before it had cured. Indeed, Banks testified that when he returned to get his tools immediately after NTI had been terminated, he noticed that the work NTI had done the previous day had been trampled.

This testimony constitutes more than a scintilla of evidence that STR's behavior not only failed to comport with standards of good faith and fair dealing, but also played a significant role in creating the situation that STR now argues justified its termination of the contract – a kitchen that did not meet the standards required by the architect and the district.

Newman furthermore testified that, within one month of starting work in the kitchen, NTI had completed a lot of it by "working and working and working" and "fighting [its] way through the kitchen, getting it done, getting it down, working." According to Banks, "pretty much" all of "the tile work and grout work in [the] kitchen had been laid" when STR terminated the contract in mid-January 2005. Frost likewise testified that the kitchen floor was substantially complete when

6

he inspected on behalf of the district. Newman testified that although he submitted four pay applications to STR seeking approximately $40,000 as payment for the work NTI had done on the project pursuant to the contract, STR only paid two of the applications, both for work NTI had completed before beginning in the kitchen. He stated that STR owed NTI approximately $20,000 under the contract. This testimony constitutes more than a scintilla of evidence that NTI was deprived of at least half of the money it was owed under the contract; a sum NTI had a reasonable expectation of receiving since it had submitted the applications seeking payment and performed the work supporting the applications. Likewise, this testimony also constitutes more than a scintilla of evidence that STR would not suffer forfeiture, *i.e.*, an unreasonable loss, because NTI completed the work for which STR had bargained and that, given the circumstances, it was unlikely that STR would pay NTI and thereby cure STR's termination of NTI.

### 2. Failure to Pay

NTI also alleged that STR breached the contract by failing to pay NTI for the work it performed. The provision in the contract governing payment reads:

> On the twenty fifth day of each month Subcontractor shall present to Contractor a statement of the work done during the preceding month, which statement, when checked and approved by contractor, will be paid within five (5) days after receipt of payment from Owner, providing progress of the work and payments for labor used and material purchased by Subcontractor have been satisfactory; provided that Contractor may, at it's option on each payment, retain 10%, or the percentage specified in the Contract Documents, of each estimate until final payment, which shall be made after completion of the work covered by this contract and written acceptance thereof by the Architect, and full payment thereof by Owner, provided Subcontractor has furnished evidence, if requested, that all claims for labor and materials have been paid, and provided further that Subcontractor has complied with all the provisions of this contract. It is understood that receipt of payment by Contractor from owner is a condition precedent to contractor's obligation to pay subcontractor for work performed.

On appeal, STR argues that pursuant to the contract, "the evidence conclusively establishes that

7

[its] obligation to pay never arose" because the district's refusal to pay STR for the rejected tile work relieved it from having to pay NTI. STR also contends that it had no obligation to pay NTI for the rejected work because NTI failed to comply with several contractual provisions, some of which were conditions precedent and others express covenants, governing the documentation NTI was required to submit in support of requests for payment. In particular, STR complains that NTI did not submit, as required, certified payment and payroll affidavits, itemized schedules of the work NTI had completed, and change orders signed by STR.

The evidence presented was legally sufficient for the jury to conclude that STR materially breached the contract and did so first by failing to pay what it owed NTI before terminating the contract. As noted above, STR argues that it did not have an obligation to pay NTI because "[it] did not receive payment for NTI's work on the kitchen tile, which is what pay applications #3 and #4 covered." It is clear that, pursuant to the contract, payment from STR to NTI was conditioned on payment from the district to STR. It is also clear that the district did not pay STR for the tile work NTI completed. However, the evidence establishes that STR paid two of the payment applications submitted by NTI during the course of the project. More importantly, there was no evidence adduced at trial that the district had paid STR for any of the work STR's subcontractors had performed up to the point that the district refused to pay STR for NTI's tile work in the kitchen. The only evidence regarding any type of payment STR received from the district was Kennedy's and Frost's testimony that the district eventually paid STR for the kitchen and for entire project, including an additional amount for extra work STR did at the district's behest. There is simply no evidence that, when STR paid NTI, it did so because it had been paid by the district for that work. Because STR had not been paid by the district, STR's partial payments to NTI were

8

not conditioned on payment to STR by the district. Accordingly, the jury could have reasonably concluded that STR abandoned this contractual provision and that STR's abandonment constituted a waiver of the provision's application under the contract. *See Landmark Organization, L.P. v. Delphini Const. Co.*, No. 13-04-371-CV, 2005 WL 2560022, \*4 (Tex.App.--Corpus Christi Oct. 13, 2005, pet. denied)(mem. op.)(rejecting contractor's argument that, until it received payment in full from the owner, the "pay when paid" clause in the contract with its subcontractor prevented it from paying interest to the subcontractor because contractor abandoned, and therefore waived the clause by sending several payments to subcontractor throughout the course of the construction project despite not having been paid by the owner when it did so).

As noted above, STR also argues that because NTI did not comply with the contractual obligations to submit certified payment and payroll affidavits, itemized schedules of completed work, and change orders signed by STR, it had no obligation to pay NTI for the work rejected by the district. However, as with the "paid-if-paid" clause discussed above, STR waived these contractual conditions by failing to insist on their adherence. Ordinarily a fact question, waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming the right and may be satisfied by showing such conduct. *Tenneco, Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). Here, as noted above, STR paid two of the payment applications submitted by NTI. STR did so despite the fact that neither payment application had supporting documentation attached to it, including certified payment and payroll affidavits and itemized schedules of completed work. As for the five change orders, it is accurate that none was signed by STR. However, this was immaterial given that STR did not intend to pay any of them, as testified by Kennedy and Brown.

9

In light of the foregoing, more than a scintilla of evidence existed permitting the jury to conclude that STR waived performance of the contractual provisions on which it now relies.

STR's first and second issues are overruled.

## DAMAGES

In its third issue, STR argues that the jury's award of contract damages must be reversed because NTI's failure to plead and obtain a jury finding on whether it substantially performed under the contract precludes it from collecting damages. We disagree.

### *Applicable Law*

Ordinarily, a party cannot recover damages if it breaches a contract. *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990). However, under the doctrine of substantial performance, a breaching party may recover damages if it has substantially complied with its contractual obligations. *Tips v. Hartland Developers, Inc.*, 961 S.W.2d 618, 623 (Tex.App.--San Antonio 1998, no pet.). To recover damages under this doctrine, a breaching party must ordinarily obtain a finding that it substantially performed. *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 481 (Tex. 1984). A breaching party, however, need not obtain a finding that it substantially performed in a case in which both parties breach and the jury, after being instructed to decide which party breached first, finds that the other party did and that its breach was unexcused. *Tips*, 961 S.W.2d at 623; *see also Fuentes v. San Anastacio Dev. Ltd.*, No. 13-08-00743-CV, 2010 WL 2967158, at *2-3 (Tex.App.--Corpus Christi July 29, 2010, no pet.)(mem. op.)(holding that because jury found that defendant committed first material breach, plaintiff did not have to obtain jury finding on its substantial performance); *Irving Flood Control Dist. v. Calgary Inc.*, No. 05-01-01462-CV, 2002 WL 1495017, at *1-2 (Tex.App.--Dallas July 15,

2002, no pet.)(not designated for publication)("The trial court's determination that the [defendant] breached the contract first renders whether [the plaintiff] substantially performed immaterial.").

### *Discussion*

The same situation identified above exists in this case, thus excusing NTI from having to obtain a jury finding on substantial performance. The jury found that: (1) both STR and NTI materially breached the contract; (2) STR was the first party to breach; and (3) STR's breach was unexcused. The jury's finding that STR was the first party to breach and that its breach was unexcused relieved NTI from further performance. *See Mustang Pipeline Co. Inc.*, 134 S.W.3d at 196 (stating that when one party commits a material breach of that contract, the other party is discharged or excused from further performance). Thus, whether NTI substantially performed is irrelevant. Accordingly, NTI is not precluded from recovering damages by failing to obtain a jury finding on substantial performance, and the trial court did not err by awarding the damages found by the jury. *See Tips*, 961 S.W.2d at 623; *Fuentes*, 2010 WL 2967158, at *2-3; *Irvin Flood Control Dist.*, 2002 WL 1495017, at *1-2. STR's third issue is overruled.

### QUANTUM MERUIT

In its fourth issue, STR argues that the evidence is legally insufficient to support recovery under *quantum meruit*. STR asserts that, as a matter of law, recovery in *quantum meruit* is unavailable "where there is an express contract provision covering the services rendered -- such rule applying equally to construction cases." According to STR, the express contract between it and NTI covered the additional services performed by NTI, and therefore, NTI cannot recover in *quantum meruit*. We disagree.

### *Applicable Law*

11

As a general rule, a plaintiff seeking "to recover the reasonable value of services rendered or materials supplied will be permitted to recover in *quantum meruit* only when there is no express contract covering those services or materials." *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988) [Emphasis added]. "There are instances when recovery in *quantum meruit* is permitted despite the existence of an express contract that covers the subject matter of the claim." *Id*. [Emphasis added]. In a dispute involving a contract case, such as the one here, a breaching plaintiff may recover in *quantum meruit* for the reasonable value of services less any damages suffered by the defendant. *Id*. at 937. "Central to the contractor's right to recover in *quantum meruit* is the owner's acceptance and retention of the benefits arising as a direct result of the contractor's partial performance." *Id*. [Emphasis added].

### *Discussion*

The evidence was legally sufficient to permit NTI to recover in *quantum meruit*. In the section of its brief discussing this issue, STR focuses exclusively on its argument that NTI cannot recover in *quantum meruit* because the basis for recovery on that ground – work reflected in the five change orders submitted by NTI – was within the scope of work encompassed by the contract. However, even if STR is correct in its assertion, NTI was nonetheless permitted to recover in *quantum meruit* if it showed that its efforts were undertaken for STR and that STR retained a tangible product of value. *See Truly*, 744 S.W.2d at 937. More than a scintilla of evidence existed permitting the jury to so conclude.

First, as reflected in the five change orders submitted by NTI, it is indisputable that NTI provided labor and materials for STR's direct benefit. In Change Order Number One, NTI requested $544 for materials and labor used to install an additional mortar bed on the kitchen floor,

12

additional work for which STR on its own created a change order.   NTI asked for approximately $301 in Change Order Number Two for purchasing and installing, at STR's behest, blue bullnose tile as finishing trim on a tile wall.   In Change Order Number Three, NTI sought $14,615 for materials and labor used in installing epoxy grout and additional tile.[4]   As with Change Order Number Two, Change Order Number Three encompasses work performed at STR's bidding. NTI solicited $2,500 in Change Order Number Four for a restocking fee levied for returning smooth tile that, according to Newman, was chosen initially by Latimer but was rendered useless when Latimer changed his mind and opted instead for abrasive tile.   As reflected in Change Order Number Five, NTI sought $6,500 for working on weekends and overtime.   Newman testified that NTI was entitled to this money because NTI's crews worked these additional hours based on STR's policy of requiring subcontractor to perform first and bill later.   Brown corroborated that this was STR's policy.

Second, it is also indisputable that STR retained a tangible product of value.   As noted above, NTI installed blue bullnose tile on a wall and additional tile on the kitchen floor at STR's request and STR was prepared to pay for the material and labor NTI used in installing an additional mortar bed in the kitchen.   As for the mistakenly-ordered smooth tile, the jury could have reasonably concluded that STR received a tangible benefit when NTI returned it for otherwise the tile would have gone to waste.   The same could be said of the labor costs associated with working overtime and on weekends.   The jury could have reasonably concluded that STR received a tangible benefit in light of STR's policy requiring subcontractors to do whatever was necessary to

---

[4] The jury awarded NTI $8,451.11 in *quantum meruit*.   In its brief, NTI concedes that, "[c]learly, the jury did not consider the total price for the labor and materials in installing epoxy grout to be part of [NTI's] quantum meruit damages."   Of the sought $14,615 by NTI in Change Order Number Three, $13,695 was attributable to NTI's purchase and installation of epoxy grout.   The remaining $920 was attributable to NTI's purchase and installation of the additional tile.

13

get the work done and STR's delays in completing the project.

Equity also supports recovery in *quantum meruit* in this case. "To justify a recovery in *quantum meruit*, the plaintiff must . . . show that the defendant has been unjustly enriched and the plaintiff would be unjustly penalized if the defendant were permitted to retain the benefits of the partial performance without paying anything in return." *Truly*, 744 S.W.2d at 938 [Emphasis added]. As calculated by the jury, NTI rendered uncompensated services worth approximately $33,000 to benefit STR, a general contractor who received more than $5,200,000 from the district. Although NTI breached the contract, so too did STR and STR did so first by terminating the contract and failing to pay NTI for its work, almost all of which was completed and which remained in place after NTI was terminated. STR now seeks to escape liability on a contract it drafted by claiming that its behavior should be ignored because a strict construction of the contract imposes no liability on it. STR, "by [its] course of conduct, has violated the reasonable expectations and values that permeate business transactions." *Id*. Accordingly, we conclude that recover in *quantum meruit* was permissible.

STR's fourth issue is overruled.

**ATTORNEY'S FEES**

In its fifth and sixth issues, STR challenges the award of attorney's fees. STR first contends that, as a matter of law, NTI was not entitled to attorney's fees pursuant to Chapter 38 of the Civil Practice and Remedies Code because there was no evidence to support an award of damages on NTI's breach-of-contract and *quantum merit* claims. We disagree. Chapter 38 permits recovery of attorney's fees in a breach-of-contract case if the litigant prevails and recovers damages. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 38.001 (West 2008); *MBM Financial*

14

*Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009). As established above, the evidence is legally sufficient to support the jury's finding that NTI prevailed on its breach-of-contract claim because STR breached the contract and did so first and to support its award of damages based on that finding.

In the alternative, STR argues, and NTI concedes, that if we reduce NTI's damages award, we must remand NTI's attorney's fees for recalculation. Because we have not reduced NTI's damages award, there is no need for us to address the issue.

STR's fifth and sixth issues are overruled.

## CONCLUSION

Having overruled each of STR's six issues, we affirm the trial court's judgment.


February 20, 2013

GUADALUPE RIVERA, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J. (Not Participating)

15