

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| COX PAVING OF TEXAS, INC. | § | No. 08-20-00164-CV |
| Appellant/Cross-Appellee, | § | Appeal from the |
| v. | § | 33rd Judicial District Court |
| H.O. SALINAS & SONS PAVING, INC. | § | of Blanco County, Texas |
| Appellee/Cross-Appellant. | § | (TC# CV08222) |

## **O P I N I O N**

Road construction is ubiquitous in Texas and sometimes ends in disputes between the contractors who do that work. That is what happened here. Following a jury trial, subcontractor H.O. Salinas & Sons Paving, Inc. (Hoss), obtained a substantial judgment against general contractor Cox Paving of Texas, Inc. (Cox). On appeal, Cox challenges: (1) the jury's liability findings in favor of Hoss under three theories of recovery—quantum meruit, breach of contract, and the Prompt Pay Act; (2) the trial court's imposition of attorney's fees, costs, and interest; (3) and the jury's finding against Cox on its breach-of-contract claim. Hoss cross-appeals, arguing that the trial court awarded Hoss insufficient attorney's fees, costs, and expenses. We affirm the portion of the trial court's judgment awarding Hoss damages under its breach-of-contract and Prompt Pay Act claims, but reverse and render the portion of the judgment awarding Hoss damages under its quantum meruit claim. Based on these holdings, we reverse the award of attorney's fees,

costs, expenses, and charges to Hoss, with a remand for a new determination of those awards consistent with this opinion.

## I. Factual and Procedural Background[1]

### A. The Contracts

In 2014, Martin County (the County) received a grant from the Texas Department of Transportation (TXDOT) to repair the County's roads. Following the bidding process, the County selected Cox[2] as the general contractor. Cox and the County executed a written agreement (the General Contract) that obligated Cox to repair approximately 40 roads covering some 90 miles. The General Contract required that the existing roadbed would be reworked such that the "[b]ase material on all roads shall have a minimum compacted thickness of 6 (six) inches." Cox, however, is in the "seal coat" business (the last phase of road construction) and does not perform road base preparation work. It disclosed that fact to the County before entering its bid. The County told Cox that it should still submit its bid and that Cox should employ a subcontractor to perform the base preparation work.

The General Contract also provided that "[r]oad preparation work is expected to vary depending on the condition of each road at the start of work . . . . Caliche shall be dumped, spread, mixed, wind rowed, watered and processed as necessary to produce a uniformly blended mixture of the desired course thickness, moisture condition, and gradation." The County was to provide the necessary caliche material to perform the repairs.

In February 2015, Cox solicited a subcontractor bid from Hoss for "base preparation" work.

---

[1] This case was transferred from our sister court in Austin, and we decide it in accordance with the precedent of that court to the extent required by Tex.R.App.P. 41.3.

[2] Cox's name sometimes appears as Blacktopper Technology, Inc. in the contract documents. Blacktopper apparently merged with or was acquired by Cox.

Before submitting a bid, Hoss's construction manager, Daniel Salinas, along with the project superintendent, John Clark, spent a day driving "at least" 75-80% of the roads. In March 2015, Hoss submitted its bid which included unit pricing for two tasks: (1) "scarify and reshape existing roadway (6") (25' width)"; and (2) applying a temporary sealant (RC-250—a type of rapid cure asphalt) and a fine aggregate to the roadway. Based on the roads involved, the subcontract totaled just over $1.8 million dollars.

Hoss had some forewarning that the County would need to bring caliche to the worksite to ensure the roadbeds met the six-inch base thickness, albeit not to the extent actually required under the General Contract. Before signing its subcontract with Cox, Hoss attended a pre-construction meeting. At that meeting, the County Judge advised that most of the roads had a six-inch base. Another County employee informed Hoss that "some" of the roads did not have six inches of base and that "they would have to bring in caliche to get it up to that minimum thickness."[3] The County assured Hoss that if there was not six inches of base, it would bring caliche out to the worksite.

Following that pre-construction meeting, Cox and Hoss entered a written subcontract (the Subcontract). The Subcontract provided that Hoss would "furnish all of the supervision, labor, equipment, services, supplies, permits, bonds, licenses and fees necessary" to complete the work it bid for, and specifically for scarifying and reshaping the existing roadway. The Subcontract also referenced the existence of the General Contract between Cox and the project owner. The Subcontract then recited Hoss's "agree[ment] to perform all of the obligations and responsibilities" of Cox under the General Contract "to the extent [they] cover or relate" to Hoss's work. Consistent with the County's promise to provide any needed caliche, the word "materials"—which would have otherwise been Hoss's obligation as a part of the Subcontract—was crossed out and initialed

---

[3] Hoss presented testimony from another County employee who had previously told the County Commissioners that the "vast majority" of the roads needed additional caliche base material.

3

by the parties on the Subcontract.

### B. Issues Arise During Repairs

Hoss began performing under the Subcontract in April 2015. It soon became apparent that many more miles of the County's roads lacked a minimum six-inch caliche base than Hoss had contemplated. Hoss informed Cox about the need for additional caliche, who in turn informed the County. The County began providing the caliche, but the pace of Hoss's work was slowed because the County's dump trucks did not provide enough caliche. And after two weeks, the County's trucks stopped dropping off caliche at the worksites altogether. Cox responded by hiring third-party trucking companies to haul in more caliche. The County paid Cox for that associated expense.

Hoss kept working in this fashion from May to December 2015. By September 2015, however, Hoss brought up with Cox receiving compensation for its extra work. In October, Hoss made Cox aware of extra equipment it needed to process and spread caliche. Cox first told Hoss that it would try and work with the County to obtain extra compensation. But at some point, Cox informed Hoss that it would not intercede with the County to obtain more funds for the extra work.

Effective December 31, 2015, Hoss and Cox mutually agreed to terminate the Subcontract for convenience. At the time of termination, Hoss had worked on about 40% of the roads, (or 43 of the 89 miles covered by the Subcontract). Hoss submitted 21 pay applications for the work it did under the contract. Most of the invoices were paid. Hoss contended, however, that Cox did not pay, or improperly reduced the amount due, on four other invoices (Applications Nos. 16, 18, 20, 21). Hoss calculated that $90,147.38 was due it under the Subcontract.

Cox hired a new subcontractor to complete the project. Cox ultimately claimed it expended $513,611.45 in out-of-pocket expenses because Hoss left the job-site. Conversely, Hoss, claimed

it had an oral agreement to be compensated for the extra-work caused by the need to add so much caliche into the roadbed. In April 2016 it made a written claim for $572,123.55 for that additional compensation. It based that figure on its calculation of 628.5 hours of extra work at a rate of $910.30 per hour.

When Cox did not pay this amount, Hoss sued Cox for: (1) breach of contract to recover the amounts due under the Subcontract; (2) quantum meruit to recover amounts due for the extra work; (3) violations of the Prompt Pay Act; and (4) fraud. Hoss also sought to recover attorney's fees. In response, Cox counterclaimed for: (1) breach of contract over the quality of Hoss's work; (2) breach of warranty based on Hoss's failure to perform its obligations under the Subcontract; (3) violations of the Deceptive Trade Practices Act; and (4) fraud. Cox subsequently abandoned its DTPA and fraud claims.

### C. The Trial and Verdict

The issues at trial largely revolved around whether Cox or Hoss breached any material term of the Subcontract, and if both did so, who breached first, and whether any breaches were excused. Hoss pointed to its unpaid invoices for the work that it did. Cox countered that Hoss's work was defective and many roads needed repair before Cox could apply the final seal coat. More particularly, it claimed Hoss failed to properly apply the RC-250 seal coat, failed to leave enough crown on the road, and failed to maintain an acceptable moisture level on the roads where it worked. Based on these failures, Cox claimed that the roads left stretches of roads with potholing and streaking. It also contended that Hoss's conduct significantly delayed the project.

In response to those assertions, Hoss defended its performance by noting that Cox never complained about the quality of its work until Hoss made a claim for the extra work. It also argued that any failure of the roadbeds resulted from Cox not timely putting down the final seal coating.

5

Hoss contended that its application of an RC-250 seal coat was only meant to protect the roadbed for several months until the final coating would be applied by Cox, and Cox's failure to timely apply the final seal coating left the roadbeds unprotected from damage by traffic.

The jury returned a verdict favorable to Hoss on its breach of contract, quantum meruit, and Prompt Payments Act claims. The jury found that neither Cox's breach of the contract, nor its failure to pay the amounts invoiced promptly, were excused. The jury failed to find that Cox committed fraud. As for damages, the jury assessed: (1) $81,897.10 in damages against Cox for breach of contract; and (2) $300,000.00 in quantum meruit damages for the reasonable value of the extra work performed. The parties had agreed that the issues of attorney's fees and any penalty interest under the Prompt Payment Act would be resolved by the trial court at the end of the case. In its final judgment, the trial court awarded Hoss: (1) the amounts that the jury's assessed in damages for the breach of contract and quantum meruit claims; (2) $24,836.68 in interest penalties under the Prompt Payment Act; (3) $44,472.29 in attorney's fees; (4) $55,000 in conditional appellate attorney's fees; (5) $24,895.68 in costs, charges, and expenses; (6) $71,605.74 in prejudgment interest; and (7) post-judgment interest at a rate of 5%, compounded annually.

## II.  ISSUES ON APPEAL

On appeal, Cox raises five issues, arguing: (1) that Hoss cannot recover under its quantum meruit claim because the contract governed all the work performed; (2) that Hoss cannot recover under its breach-of-contract claim because Hoss first breached the contract; (3) that Hoss cannot recover under the Prompt Payment Act because no payments were due given Hoss's breach; (4) that Cox should recover under its breach-of-contract claim; and (5) if this Court reverses any portion of the judgment in Cox's favor, the case should be remanded to the trial court for a new determination of attorney's fees, interest, and court costs. Hoss cross-appeals and argues in two

6

issues that the trial court erred by awarding less than the amount it proved up for attorney's fees, costs, expenses, and charges.

## III.  QUANTUM MERUIT

### A.  Standard of Review and Applicable Law

Quantum meruit is a common-law equitable remedy that is "based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018), *quoting In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005). The purpose of quantum meruit is "to prevent a party from being 'unjustly enriched' by retain[ing] the benefits of the . . . performance without paying anything in return." *Id.*, *quoting Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988) (internal quotation marks omitted). A plaintiff seeking to recover under quantum meruit must prove: (1) valuable services were rendered or materials furnished; (2) for the party sought to be charged; (3) those services and materials were accepted by the party sought to be charged, and were used and enjoyed by the party; and (4) the party sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the party sought to be charged. *Id.* at 732-33, *citing Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990).

Because quantum meruit is based on an implied agreement, a party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished. *Id.* at 733, *citing In re Kellogg Brown & Root*, 166 S.W.3d at 740. That rule invites the question of whether the parties' contract covers the services or materials for which the quantum meruit claim is made. And that question often turns on interpretation of the parties' existing contract. When interpreting the terms of a written contract, a reviewing court's "fundamental

objective is to effectuate the parties' intent as expressed by the words chosen to memorialize their agreement." *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019). We are bound to interpret the terms of the contract as written and not how the parties would like them to have been written. *Nelson v. Vernco Constr., Inc.*, 566 S.W.3d 716, 750 (Tex.App.--El Paso 2018, judgm't set aside, op. not vacated).

The question of whether an express contract covers the services at issue is a legal question reviewed de novo. *Hill*, 544 S.W.3d at 737. The construction of an unambiguous contract is also a question of law that we review de novo. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

## B. Analysis

On appeal, Cox argues that because the General Contract and Subcontract already govern the spreading and balancing of new base material, Hoss would not be entitled to additional payment for performing that task. Cox contends this is so regardless of any unforeseen difficulties or expenses associated with Hoss's work. Thus because the express terms of the Subcontract governed the services Hoss furnished, Hoss could not recover under its quantum meruit theory.

Cox relies in part on this Court's decision in *Nelson v. Vernco Constr., Inc.* There, a subcontractor sued for breach of a subcontract related to a TXDOT prime contract for road construction, claiming that it was entitled to additional payments. 566 S.W.3d at 730. The subcontractor succeeded at trial. *Id.* at 741. On appeal, the subcontractor argued that the award was proper because, without additional payments, it would have been required to perform its obligations despite being in a "negative cash-flow position, making it economically unreasonable to perform the contract." *Id.* at 754. This Court rejected that argument, reasoning that "total performance in light of changing circumstances is exactly what [the subcontractor] bargained for

. . . when it submitted a hard bid. [The subcontract] not only gives the general contractor the power to add or subtract things from the Subcontract, but it explicitly requires [the subcontractor] to execute those changes . . ." *Id*. at 754. We added that "[c]hanging circumstances are always a background risk in submitting a hard bid," and "'[t]he intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract.'" *Id.*, *quoting SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) (per curiam).

Cox also points to *D2 Excavating, Inc. v. Thompson Thrift Constr., Inc.*, a Fifth Circuit decision considering whether an award for breach of contract and quantum meruit was proper when a subcontractor sought additional payment for site grading and excavation work. 973 F.3d 430, 432 (5th Cir. 2020). The trial court awarded breach of contract and quantum meruit damages for the work the subcontractor had performed. *Id*. at 433.

In reversing the trial court, the Fifth Circuit first recognized the default Texas rule "that the party doing the work bears the risk that it will end up being more difficult than anticipated unless the contract shifts that risk to the buyer of the services." *Id.* at 434, *citing Lonergran v. San Antonio Loan & Tr. Co.*, 104 S.W. 1061, 1065-66 (1907), *and Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 720-21 (5th Cir. 2005) ("In order for an owner to breach a contract by supplying inadequate plans to a contractor, [Texas law] require[s] that the contract evidence an intent to shift the burden of risk of inadequate plans to the owner."). The court further stated, "This default rule flows from the basic contract principle that 'where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.'" *Id.*, *quoting El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811 (Tex. 2012). Applying this rule, the court held that the contract did not allocate the risk to the general contractor that the worksite would be

9

unfavorable, pointing to the subcontract's language that the subcontractor agreed that it had "visited the Project site, become familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents." *Id.*

The Subcontract here similarly allocated to Hoss the risk of unanticipated additional expenses to scarify and reshape the roads. The Subcontract first contained Hoss's representation that it was fully aware of the conditions of the work, had made all necessary investigation, and assumed the risk that conditions were different than described in the General Contract:

> 1.3     Subcontractor represents that it has examined or had an opportunity to examine all of the documents . . . which relate to the Work and is fully acquainted with all of the physical conditions surrounding the Project, insofar as the same affects or relates to the performance of the Work, and has made all necessary investigations essential to the full understanding of any and all difficulties that may be encountered in the performance of the Work. Subcontractor assumes any and all risks incident to any variance between the actual physical conditions at the job site affecting the Work and those set out in the General Contract.

The Subcontract also expressly denied extra compensation caused by delays or acts of the County or Cox:

> 2.3     . . .
> In the event the Subcontractor's performance of this Subcontract is delayed or interfered with by the acts of the Owner, Contractor or other subcontractors, it may request an extension of time for the performance of the Work, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delays or interference.

Under the Subcontract's Article 3, entitled "Subcontractor Obligations and Warranties," Hoss agreed that it had examined the contract documents, the condition of the road, and that it was not relying on any statements of the County or Cox:

> 3.1     Subcontractor represents and agrees that it has carefully examined and understands the Contract Documents and has investigated and satisfied itself as to the nature and location of the Work and the conditions and anticipated difficulties under which it is to be performed; the character, quantity, quality and kinds of materials needed, the adequacy and composition of any surface or subsurface conditions necessary to assure proper installation of the Work; the kinds and

10

quantity of equipment needed; and, that Subcontractor enters into this Subcontract on the basis of its own examination, investigation and evaluation of all such matters, and not in reliance upon any opinions or representations of the Contractor, or the Owner, or any of their respective officers, agents or employees.

But before considering how these clauses fit into the dispute, we begin with the question of whether adding caliche to the roadbed was part of Hoss's contract.

Hoss urges that the Subcontract "strictly ties Hoss's obligations . . . to scarify and reshape the existing roadway," and that the Subcontract did not mention any obligation to "'spread and balance' any new caliche (or 'flex') base material that might be required." The fallacy in this argument, however, is that Hoss was required by its subcontract to *both* "furnish all of the supervision, labor, equipment, services, supplies, permits, bonds, licenses and fees necessary" to complete the work it bid for (scarifying and reshaping the existing roadway), and also to "perform all of the obligations and responsibilities" of Cox under the General Contract "to the extent [they] cover or relate to" Hoss's work.[4] The General Contract, made a part of the Subcontract, expressly states that "Caliche shall be dumped, spread, mixed, wind rowed, watered and processed <u>as necessary</u> to produce a uniformly blended mixture of the desired course thickness, moisture condition, and gradation (emphasis original)." And it states the obvious that if Hoss was scarifying (breaking up the existing roadbed) and "reshaping" it, that working in any needed caliche would

---

[4] The Subcontract contained an integration clause that incorporates the terms of the General Contract:

> 1.2     The General Contract and the general conditions, special conditions, plans, drawings, specifications, bulletins, addenda and amendments (the "Contract Documents") as the same relate to the Work are incorporated herein by reference and Subcontractor agrees to perform its part of the Work in strict accordance with and reasonably inferable from the Contract Documents and be bound by the terms and conditions of said documents and assumes and agrees to perform all of the obligations and responsibilities of the Contractor under said documents to the extent said documents cover or relate to the Work.

11

be *related to* that job.[5]

Given that the Subcontract required Hoss to process the extra caliche into the roadbed, its other contentions are all belied by the Subcontract's terms. Based on the plain terms of the Subcontract, Hoss generally bore the risk of incurring extra expenses if difficulties arose in its work. While Hoss argued it was misled by the County Judge as to the number of roads needing additional caliche, Hoss represented in Section 3.1 of the Subcontract that it had "investigated and satisfied itself as to the nature and location of the Work" and did not rely "upon any opinions or representations of the Contractor, or the Owner, or any of their respective officers, agents or employees." Hoss also complains that the County at first failed to timely deliver caliche, but Section 2.3 expressly answers that complaint, stating that Hoss was not entitled to any increased compensation occasioned by delays caused by the County. Cox further adds that: (1) Hoss submitted no contemporaneous invoices for the Extra Work; and (2) failed to obtain a written agreement or change order with Cox for additional payment for the Extra Work. And finally, while Hoss contended that it never had access to the General Contract, it nonetheless represented in the Subcontract that it had "examined or had an opportunity to examine all of the documents which relate to the Work," which, according to Section 1.2 of the Subcontract, included the General Contract incorporated by reference in the Subcontract's integration clause.

We also agree with Cox that Hoss cannot recover under the "partial performance" doctrine—an exception to the general rule that a valid contract covering the provision of goods or services bars a quantum meruit claim. *See D2 Excavating, Inc.*, 973 F.3d at 436. This exception

---

[5] Cox also argues in its briefing that "scarify and reshape" is a defined term under TXDOT Specification Manual Item 251 ("Reworking Base Courses"). Cox further notes that Hoss's construction manager testified below that the scope of Hoss's work was defined by Item 251. And Item 251 defines "scarifying and reshaping" expressly to include shaping the road subgrade to conform to the project plans, which here required a uniform 6-inch base using caliche supplied by the County. While all the parties agreed that Item 251 governed here, the text of that Item was not admitted into evidence, and given our view of the actual contract language, we find no need to take judicial notice of Item 251 as Cox requests.

12

allows a "plaintiff that does not substantially perform a construction contract, and thus 'cannot recove[r] under the express contract,' [to] pursue quantum meruit for the value of its services." *Id.*, *quoting Murray v. Crest. Constr., Inc.*, 900 S.W.2d 342, 345 (Tex. 1995). The rationale for this exception is that because partial work done on a construction contract cannot be transferred to another buyer, it would be unjust to allow the party receiving the partial construction not to pay anything for it. *Id.* The exception, however, does not apply when the subcontractor substantially performs its contractual duties, thus allowing recovery based on the contract. *See id.*

Hoss cannot rely on the exception because it did not request or submit jury findings on whether it partially performed its duties under the Subcontract. Because the jury did not enter findings on the partial-performance exception, Hoss has waived any argument that the exception applies here. *See* TEX.R.CIV.P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."); *see also Union Bldg. Corp. v. J & J Bldg. & Maint. Contractors, Inc.*, 578 S.W.2d 519, 521-22 (Tex.App.--Houston [14th Dist.] 1979, writ ref'd n.r.e.) (holding that a party who failed to request special issues related to a quantum meruit recovery waived those issues on appeal).

In sum, the contract language here tracks the default rule in Texas that the party doing the work, not the purchaser of services, bears the risk that the work may be more difficult to perform than anticipated. *See D2 Excavating*, 973 F.3d at 434. The plain language of the Subcontract governs the extra work Hoss performed, and Hoss agreed to bear the risk of unanticipated difficulties that might arise during the performance of its duties under the Subcontract. Because the Subcontract governed the extra work Hoss performed, we find that Hoss's quantum meruit award was precluded as a matter of law.

13

Cox's Issue One is sustained.

## IV. BREACH OF CONTRACT

Next, we consider whether legally and factually sufficient evidence supports the jury's finding that Cox breached the Subcontract and the mirror image finding that Hoss did not breach.

### A. Standard of Review

Legal and factual sufficiency arguments both challenge the sufficiency of the evidence to support determinations by the fact finder; but each invoke a different standard of review. *Wolf v. Starr*, 617 S.W.3d 898, 903 (Tex.App.--El Paso 2020, no pet.). Under a legal sufficiency or "no evidence" challenge, we will uphold a jury's finding if it is supported by "[a]nything more than a scintilla of evidence." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014), *quoting Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach the finding or judgment being challenged. *See Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (the test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."). On the other hand, if the evidence is so weak that it only creates a "mere surmise or suspicion" of the existence of a vital fact, "it is regarded as no evidence." *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

In resolving a no-evidence challenge, we view the evidence in the light most favorable to the finding or judgment, and "indulge every reasonable inference that would support it," crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 822, 827. It is the province of the trier of fact to draw from the evidence whatever inferences it wishes, so long as more than one

14

inference is possible. *Id.* at 821-22. Thus, we will sustain a legal sufficiency or "no evidence" challenge only if the record shows: "(a) the complete absence of a vital fact; (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact." *Id.* at 810, *quoting* Robert W. Calvert, "No Evidence" & "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960).

When a party challenges the factual sufficiency of the evidence, it concedes that conflicting evidence was presented at trial, but argues that the evidence against a finding or judgment is "so great" that to find the opposite was erroneous. *See Wolf*, 617 S.W.3d at 903. Factual sufficiency challenges require courts of appeals to weigh all the evidence. *See Eggemeyer v. Hughes*, 621 S.W.3d 883, 890 (Tex.App.--El Paso 2021, no pet.), *citing Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). A factual sufficiency challenge is sustained only when the evidence supporting the finding is so weak "as to be clearly wrong and unjust," or when the finding is "manifestly unjust," "shock[s] the conscience," or "clearly demonstrate[s] bias." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

In applying either standard, we remain mindful that the trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony. *In re Estate of Scott*, 601 S.W.3d 77, 88 (Tex.App.--El Paso 2020, no pet.); *see also McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trier of fact may choose to believe one witness and disbelieve another, and resolve conflicts, and we must not impose our opinion to the contrary, if the trier of fact's resolution "falls within [the] zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

**B. Analysis**

The jury found that (1) Cox breached the Subcontract; (2) Cox was not excused by a prior

material breach by Hoss; (3) Hoss did not breach the Subcontract; (4) Cox failed to promptly pay Hoss; (5) Hoss's breach of contract damages totaled $81,897.10 We discuss the evidentiary challenges to those questions together because they implicate interrelated testimony.

"A party breaches a contract when he fails to perform an act that he has expressly or impliedly promised to perform." *Duncan v. Woodlawn Mfg., Ltd.*, 479 S.W.3d 886, 894 (Tex.App.--El Paso 2015, no pet.), *quoting STR Constructors, Ltd. v. Newman Tile, Inc.*, 395 S.W.3d 383, 387 (Tex.App.--El Paso 2013, no pet.). When one party commits a material breach, the other party is excused from further performance under the contract. *Id.*, *citing Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 198 (Tex. 2004). This rule often requires a determination of which party breached first. *Id.*, *citing Mustang Pipeline*, 134 S.W.3d at 200.

Materiality was defined for the jury with a series of factors lifted from the Texas Supreme Court's *Mustang Pipeline* case. *See Mustang Pipeline*, 134 S.W.3d at 199 (listing similar factors). The jury was instructed to consider these factors in determining the materiality of a breach: (1) how the injured party will be deprived of the benefit of which he reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing.

In its answer to question one, the jury found that Cox breached a material term of the contract. There was evidence in the record that Cox did not pay four of the payment applications that Hoss submitted while it was on the job. In the termination for convenience memo, Cox states

16

that it would pay Hoss for "work that is completed and is paid for by the County." Cox's primary response to non-payment claim is that it was excused from making the payments due to Hoss' failure to perform.[6] The jury, however, answered in question two that Cox's breach was not excused, and in question four, the jury found that Hoss did not commit a material breach. We discuss the evidence on those issues together.

Cox argues that any failure to pay was excused by Hoss's breach of the Subcontract due to the defective and untimely performance of its duties. Cox notes that multiple witnesses testified that Hoss's work was substandard and skirted proper specifications, forcing Hoss to redo its work and causing delays between July and September 2015. Cox further alleges that Hoss's breach prevented Cox from applying the top rubber seal to the roads.

Even so, the jury was free to believe that Cox, not Hoss, was responsible for the defects in the roadbed by its failure to timely apply the final seal to the roads. The evidence shows that Hoss was responsible for first scarifying and reshaping the six-inch base on the roads, and then shooting RC-250 (a layer of petroleum oil) and spreading Grade 5 aggregate to form an "inverted prime coat" on the roads. This coating was only meant to temporarily protect the roadbed (for two or three months) before the final rubber-asphalt seal coat was applied by Cox. The record contains some evidence that Cox did not timely apply the final asphalt seal coat, and that Cox had not moved its sealing equipment into Martin County until Spring 2016, months after Hoss completed its work on the roads. Hoss presented testimony from John Clark, a civil-construction contractor employed by Hoss, that while Hoss was working on the roads in 2015, he never saw any Cox equipment performing final seal coating at all during that period. Clark had previously discussed

---

[6] Cox did offer testimony that it had issued checks for those invoices, but it would have required Hoss to sign a release to receive the checks, which Hoss was unwilling to do.

with Cox's principal, Josh Cox, that once Hoss had enough roads ready, Cox would follow along behind to put on the final seal coat. By June, Clark started to get "nervous" when he did not see Cox's equipment putting on the final seal coat and he raised the issue with Josh Cox. Cox replied that they were "busy" and trying to get to the project. Clark continued to raise the issue with Cox in June and July.[7] Clark testified that without the final rubber-asphalt seal coat, the roadbed was subject to damage from vehicles passing over it. Hoss also presented testimony from David Gilver, a civil engineer, that with only the temporary inverted prime coat, the roads could not withstand harsh conditions like high temperatures and heavy traffic.

At trial, Hoss rebutted the criticism of its adherence to the construction schedule in two ways. First, Cox was directly involved in the delivery of caliche to the roads and Hoss could work no faster than the caliche was available to spread and mix into the roadbed. And while Hoss had to return to several roads to "redo" its work, it attributed those situations to where the inverted prime road been exposed too long without a final seal coat.

Hoss also presented testimony that its pay applications from May 2015 to October 2015, as submitted to Cox, were approved by the grant administrator and the County, despite some complaints by local residents over the conditions of the roads. Hoss also notes there were no written complaints about the work while Hoss was on the project. This evidence supports an inference that while Hoss's work may not have been perfect, any deficiencies were not material.

And this view of the evidence unwinds the balance of Cox's arguments. Cox argues that Hoss's failure to timely perform deprived Cox and the County of the benefit of having functioning roads in good working condition. Yet one view of the evidence shows that it was Cox's delay in putting on a final seal that deprived the County of proper roads. Echoing another *Mustang Pipeline*

---

[7] A Cox witness had testified that the ideal season to put down the final seal coating is between April to October.

factor, Cox urges that there was "no likelihood" of Hoss curing its faulty work because it reworked several portions of the road that still failed to conform to proper standards. Yet the testimony that Cox did not bring in the equipment to apply the final seal until March 2016, suggests that any additional work Hoss could have undertaken to repair the roads would have been fruitless due to the lack of final sealant on the roads. Cox also urges that Hoss failed to act in good faith because it waited until after it materially failed to perform and the Subcontract was terminated to demand additional payment from Cox. While we might agree the demand for the additional payments was improper (as we have rendered judgment on that claim), under the evidence, the termination for convenience was by mutual agreement. Nothing in the language of the mutual termination supports bad faith by either party.

In sum, there is more than a scintilla of evidence that Cox, not Hoss, was responsible for the deficient work, which renders Cox's prior-material-breach justification unavailing. We hold that Cox's legal sufficiency challenge to the jury's finding on this matter must fail. Neither do we find that the evidence is so against the great weight and preponderance of the evidence as to be manifestly unjust. Again, there is conflicting evidence on which party's failure to perform caused the roads to be unacceptable. Although Cox presented testimony establishing that the quality of Hoss's work did not comply with the Subcontract's requirements, the jury was free to reject that testimony and credit the evidence tending to suggest that Cox's failure to timely apply the final seal coat caused Hoss's work to be substandard.

We overrule issue two (Cox's liability for breach of contract) and issue four (denial of Cox's claim for breach of contract).

## V. PROMPT PAY ACT DAMAGES

The trial court's award of $24,836.68 in penalty interest under the Prompt Pay Act, which

was based on Hoss's breach of contract claim addressed above. *See* TEX.PROP.CODE ANN. § 28.004 (providing for interest on overdue payment). The only argument that Cox advances to challenge this award is that if we decide the breach of contract issue in its favor, we should also reverse the Prompt Pay Act award. Both parties agree that the resolution of this issue turns on our disposition of Cox's breach of contract issue. Because we decide that issue against Cox, we hold that the trial court did not err by awarding damages under the Prompt Pay Act.

Cox's Issue Three is overruled.

## VI. ATTORNEY'S FEES, COSTS, EXPENSES, AND CHARGES

At trial, Hoss prevailed on its quantum meruit and breach of contract claims. Both theories might support an attorney's fee award to a prevailing claimant. *See* TEX.CIV.PRAC.& REM.CODE ANN. § 38.001(1), (2), (3), (8) (providing for an award of attorney's fees on claims for services and labor rendered and furnished material, and for oral or written contract); *Cox's Fiesta Supermarkets of San Antonio, Inc. v. WMS, L.L.C.*, No. 04-17-00699-CV, 2018 WL 2694780, at *3 (Tex.App.--San Antonio June 6, 2018, no pet.) (mem. op.) (a party who prevails on a quantum meruit claim may recover attorney's fees); *Gentry v. Squires Constr., Inc.*, 188 S.W.3d 396, 406 (Tex.App.--Dallas 2006, no pet.) (same). Of course, claimants seeking attorney's fees "have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). But the trial court here would not have considered segregation, or any of its exceptions, because all the theories would have supported a fee award.

Cox argues that if we are to reverse any portion of the trial court's judgment—as we have—the judgment for the court's award of attorney's fees, costs, expenses, and charges must also be reversed and remanded for reconsideration by the court. Arguing that the trial court erred in not

awarding sufficient attorney's fees, Hoss also seeks a remand of the case to the trial court for a new determination of those matters. Given our disposition of Cox's first issue, we reverse the trial court's award of attorney's fees, and remand the case for the trial court to determine the amount of fees due on the claims for which we upheld. *See, e.g.*, *Foster v. Stump*, No. 01-98-00656-CV, 2000 WL 1059776, at \*4 (Tex.App.--Houston [1st Dist.] Aug. 3, 2000, no pet.) (mem. op.) (reversing and remanding to the trial court the issue of attorney's fees awarded to the plaintiff where the appellate court reversed only some of the plaintiff's claims that they prevailed on in the trial court); *see also McAnelly v. Brady Med. Clinic, P.A.*, No. 03-04-00095-CV, 2004 WL 2556634, at \*4 (Tex.App.--Austin Nov. 12, 2004, no pet.) (mem. op.) (remanding case to the trial court for determination of attorney's fees attributable to a quantum meruit claim where trial court erroneously entered a JNOV on that claim).

Cox's Issue Five is sustained. Hoss's Issues One and Two are overruled.

## VII.  CONCLUSION

We reverse the portion of the trial court's judgment that awards damages to Hoss under its quantum meruit claim and render judgment against Hoss on that claim. We also reverse the award to Hoss for attorney's fees, costs, expenses, and charges, and we remand the case to the trial court for a new determination of those issues. We affirm the trial court's judgment in all other respects.


JEFF ALLEY, Justice

October 12, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

21